**OSRECOVERY, INC., et al., Plaintiffs,**

v.

**ONE GROUPE INTERNATIONAL, INC., et al., Defendants.**

**No. 02 Civ. 8993(LAK).**

United States District Court,
S.D. New York.

May 9, 2003.

Wayne C. Matus, LeBoeuf, Lamb, Greene & MacRae, LLP, New York City, for Plaintiffs.

Edward F. Westfield, Edward F. Westfield, PC, New York City, for Defendant Randy L. Johnson, Jr.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The complaint alleges that defendants, spearheaded by Randy L. Johnson, David C. Reed, and One Groupe International, Inc. ("One Groupe"), perpetrated a massive fraud involving civil RICO and securities law violations. They allegedly conducted "a fraudulent operation fronted by the sale of a non-existent gold-backed currency and ... fueled by a mammoth 'Ponzi' scheme disguised as a guaranteed high-yield investment program."[1] This allegedly resulted in investment losses exceeding $250 million. The matter is before this Court on plaintiffs' motion for an order compelling Johnson to answer deposition questions and to produce certain business records over his claim of the Fifth Amendment's privilege against self-incrimination.

### I.  Facts

#### A.  The Complaint

The plaintiffs in this action include OS-Recovery, Inc., a New York corporation that purports to represent the interests of approximately 3,400 individuals who were account holders or investors in the allegedly fraudulent scheme, as well as several individual plaintiffs.

The complaint alleges that defendants Reed and Johnson and a number of entities[2] controlled by them carried out a two-level scheme to defraud investors.[3] The first level involved the sale to investors, for real currency, of so-called electronic currency, or "e-currency," accounts denominated in "OSGold," the balances in

---

1.  Second Am. Compl. ¶ 1.

2.  These entities include One Groupe, OS-Gold.com, OSOpps.com, and Ecurrency Exchange. Inc.

3.  Various affidavits previously filed with this Court allege that Johnson played a significant role in the allegedly fraudulent operation underlying the complaint. See, e.g., Pls.' Ex Parte Application for T.R.O. and Order to Show Cause Regarding (1) Attach. and (2) Prelim. Inj., Van Winkle Aff. ¶¶ 8–10, 21, 23, 25, 28, 35; id., Zuchristian Aff. ¶¶ 3, 5–7, 9.

which supposedly were (1) usable to purchase goods and services on the Internet, (2) accessible with a debit card, and (3) freely convertible upon demand into gold. The second level involved the sale to investors, for OSGold, of high-yield investment programs known as "OSOpps," which promised investors returns of thirty percent per month on three-month investments and forty-five percent on twelve-month investments and the guaranteed return of principal on maturity. According to the complaint, OSGold was not gold-backed or convertible into gold, as defendants represented.[4] The complaint asserts further that the OSOpps investment programs were simply Ponzi schemes that paid the promised returns for a brief period from capital put up by new investors and then collapsed. In any case, the complaint alleges that the entire operation ceased without explanation, leaving the investors holding the bag.

4. Johnson allegedly referred to OSGold as "monopoly money." *Id.*, Zuchristian Aff. ¶ 35.

5. Matus Letter, Dec. 20, 2002, Ex. A.

6. *Id.* at Ex. B.

7. *Id.* at Ex. C. Johnson's answers covered: (1) his name and address; (2) that he lives in a home; (3) that he received a copy of the notice of deposition; and (4) that he did not read it. *Id.*

8. *Id.* Johnson invoked the privilege against self-incrimination and declined to answer: (1) whether he owns or rents his home; (2) how long he has lived at his current address; (3) whether he lives with others; (4) whether he searched for any documents requested by plaintiffs; (5) whether he remains an officer or shareholder of any of the defendants in this case; (6) whether he is a ten percent shareholder in Ecommerce Exchange; (7) whether he has access to Ecommerce Exchange documents; (8) whether he looked for responsive documents of the core defendant companies; (9) whether he holds any documents in a

## B. The Disputed Discovery

### 1. Background

On November 18, 2002, plaintiffs served Johnson with a notice of deposition, which included a request for the production of various documents.[5] The expansive request sought twenty-three categories of documents, including corporate records of One Groupe, OSGold, OSOpps, Ecommerce Exchange, Ecurrency Exchange, and Card Accounts.TV, as well as Johnson's personal records. Johnson asserted his privilege against self-incrimination and declined to produce any documents.[6]

At the deposition, Johnson answered a few preliminary questions.[7] He refused, however, to answer most questions on the ground that doing so might incriminate himself.[8] After twenty minutes of fruitless inquiry, plaintiffs suspended the deposition.

representative capacity (i.e., as an officer, director, or shareholder); (10) whether he knows David Reed; (11) whether he knows Frank Zuchristian; (12) whether he is familiar with any of the names on the list of defendants presented to him; (13) whether he sees his name on the list of defendants; (14) which lawyer advised him to invoke the privilege against self-incrimination; (15) his social security number; (16) whether he has a passport; (17) whether he is aware that there is an order from a United States District Court that he is not allowed to dissipate or transfer assets; (18) whether he owns a computer; (19) whether he has access to a particular computer, or has access to computers owned, controlled or utilized by other defendants; (20) whether he has access to any of the databases; (21) whether he ever has spoken to Rick Young or other defendants; (22) where Mr. Reed keeps his money and where the money deposited into OSGold currently is located; (23) where he banks; (24) what companies he owns or controls; (25) what is "EGold"; (26) what are "Randy's books"; and (27) whether he and Mr. Zuchristian own "card accounts TV." *Id.;* Westfield Letter, Dec. 23, 2002, at 3.

Plaintiffs now request that the Court order Johnson to produce the responsive corporate records currently in his possession and answer deposition questions not shielded by the Fifth Amendment.[9] The Court heard oral argument and has received written submissions from the parties.

### 2. The Parties' Arguments

Plaintiffs assert that Johnson invoked the Fifth Amendment in a blanket and unsubstantiated manner without genuinely reflecting on whether answering each question might provide the government with evidence for a future prosecution. Johnson counters that his apprehension of criminal proceedings is justifiable and that he reasonably fears that answers would " 'furnish a link in the chain of evidence needed to prosecute him' for a crime." '[10] Plaintiffs argue also that Johnson waived his Fifth Amendment privilege with respect to the matters to which he testified in a recent affidavit as well as to relevant impeachment.[11] Johnson insists that "[n]o waiver was intended, and none was effected."[12]

Regarding the corporate documents, plaintiffs assert that Johnson remains an employee or agent of the core defendant companies and therefore cannot invoke the Fifth Amendment to avoid production. Johnson contends that he no longer is a corporate agent so the act of production would be in his personal capacity and that the act itself would constitute compelled self-incriminating testimony. Plaintiffs respond that Johnson's alleged resignation, if it in fact occurred, at best was serendipitous and more likely was designed to frustrate discovery. Either way, plaintiffs argue, allowing Johnson to avoid critical discovery because of his alleged "resignation" would be "unjust."[13] Plaintiffs request that this Court at least appoint a custodian to produce all responsive documents currently held by Johnson.[14] Johnson characterizes this request as a baseless effort to evade the full force of the Fifth Amendment.[15]

### II. Discussion

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."[16] It applies "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory ... [, testimony in which the] witness reasonably believes could be used in a criminal prosecu-

9. As plaintiffs conceded at oral argument, their current application does not seek this Court's intervention with respect to responsive *personal* documents in Johnson's possession, which arguably would present a more complicated issue in light of recent case law. *See United States v. Hubbell*, 530 U.S. 27, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000). It appears that *Hubbell* may have "restored Fifth Amendment protection to many private papers in the possession of individuals." *See, e.g.*, Lance Cole, *The Fifth Amendment and Compelled Production of Personal Documents After* United States v. Hubbell—*New Protection for Private Papers*, 29 Am. J.Crim. Law 123, 124 (2002).

10. Westfield Letter, Dec. 23, 2002, at 1 (quoting *Estate of Fisher v. Comm'r of Internal Revenue*, 905 F.2d 645, 648 (1990) (quoting

*Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951))). At oral argument, Johnson's counsel added also that he objected to a few questions on the basis of form, and he acknowledged that there might be a few questions in which he would now differently instruct his client regarding whether to answer.

11. Matus Letter, Jan. 16, 2003, at 1.

12. Westfield Letter, Jan. 22, 2003, at 2.

13. Matus Letter, Jan. 16, 2003, at 1.

14. *Id.* at 2.

15. Westfield Letter, Jan. 22, 2003, at 2.

16. U.S. Const. amend. V.

tion or could lead to other evidence that might be so used." [17]

## A. Deposition Questions

### 1. Generally

■ An individual may invoke the Fifth Amendment to decline to answer a deposition question when the individual has reasonable cause to apprehend that answering the question will provide the government with evidence to fuel a criminal prosecution.[18] This Circuit, however, routinely has held that "[t]he danger of self-incrimination must be real, not remote or speculative," and "[w]hen the danger is not readily apparent ... the burden of establishing its existence rests on the person claiming the privilege." [19] Determining whether the privilege is available in given circumstances thus involves essentially a factual inquiry. A judge must determine, "from the implications of the question, in the setting in which it is asked," whether "a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." [20]

■ Criminal prosecution of Johnson is a "real danger" [21] and is not too remote or speculative. But that in itself does not justify invocation of the privilege to avoid answering virtually all questions.[22] The questions that Johnson has declined to answer fall into two categories: (1) those

17. *Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (footnotes omitted); *In re DG Acquisition Corp.*, 151 F.3d 75, 79 (2d Cir.1998) (quoting *Kastigar* ).

18. The assertion of the privilege cannot stand without reasonable cause. *E.g., New York State N.O.W. v. Terry*, 886 F.2d 1339, 1357 (2d Cir.1989) (upholding the district court's decision that a defendant must answer certain questions, which would not link him with criminal activity, and rejecting the defendant's contention that he need not explain how certain disclosures might incriminate him); *United States v. Zappola*, 646 F.2d 48, 53–54 (2d Cir.1981) (holding as error the district court's acceptance of an individual's invocation of the Fifth Amendment's privilege against self-incrimination without conducting a particularized inquiry).

19. *Fisher*, 905 F.2d at 649. If the danger is not readily apparent, "the witness then must endeavor to explain how his answer will be incriminatory." *United States v. Edgerton*, 734 F.2d 913, 919 (2d Cir.1984). *In camera* review may be necessary for the witness to make such a showing. *E.g., Fisher*, 905 F.2d at 650; *AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. and Trade Servs., Inc.*, No. 96 Civ. 9056(JGK)(AJP), 1999 WL 970402, at *8–*9 (S.D.N.Y. Oct. 25, 1999).

20. *Hoffman*, 341 U.S. at 486–87, 71 S.Ct. 814; *see, e.g., Zappola*, 646 F.2d at 53 (holding that a government informant could not legitimately fear prosecution, justifying the invocation of the Fifth Amendment, when asked about conduct for which the informant was protected from prosecution). The assessment of whether an injurious disclosure likely will result " 'must be governed as much by ... [the judge's] personal perception of the peculiarities of the case as by the facts actually in evidence.' " *Hoffman*, 341 U.S. at 487, 71 S.Ct. 814 (quoting *Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D.Ohio 1896) (Taft, J.)).

21. *See, e.g., Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 480, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972).

22. Even when the Fifth Amendment shields a civil litigant from having to answer a question, this does not protect the litigant from the consequences of an adverse inference. The Supreme "Court has recognized 'the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them,' at least where refusal to waive the privilege does not lead 'automatically and without more to [the] imposition of sanctions.' " *Mitchell v. United States*, 526 U.S. 314, 328, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (internal citations omitted). Thus, civil litigation may proceed despite a party's invocation of the Fifth Amendment.

where the danger of self-incrimination is readily apparent, and (2) those where the danger is less apparent and insufficient as currently identified by Johnson. Johnson need not answer the former questions, but he must answer each of the latter questions unless he articulates a credible basis for invoking the Fifth Amendment.[23] Of course, this involves a balancing act because the privilege would not provide much protection if the requisite showing were too demanding.

■ Further elaboration with respect to these two categories of questions is helpful. In this case, the first category certainly encompasses any question that seeks information related to the alleged fraud. It is readily apparent that Johnson might inculpate himself by answering such a question. Hence, such questions fall squarely within the umbrella of Fifth Amendment protection. For example, Johnson properly invoked the privilege when he declined to answer questions involving his relationship to the core defendant companies and other entities as well as his knowledge of other defendants and the alleged fraud.

Questions unrelated to the alleged fraud are another matter. For example, it is not self evident that responses to questions such as whether Johnson owns or rents his home, how long he has lived at his current address, and whether he lives with others pose any risk of inculpation. Another question not likely to yield an evidentiary link that might be used in prosecuting Johnson is whether he has searched for documents requested by plaintiffs, given that at least some documents might not be

protected. Indeed, even Johnson's counsel advised him to "[g]o ahead and answer"[24] this question–although Johnson invoked the Fifth Amendment anyway.

Johnson's ritualistic assertion of the Fifth Amendment does not justify his refusal to answer apparently innocuous questions, and no further elaboration has been offered in response to plaintiffs' application. Indeed, Johnson's behavior suggests an unprincipled and ill-advised effort to frustrate lawful discovery.

### 2. Waiver

■ As the preceding discussion suggests, Johnson's invocation of the privilege, although overly broad, was appropriate in some instances. There remains, however, the possibility that Johnson waived his Fifth Amendment privilege, at least to some degree, by submitting an affidavit stating: "As of the date this action was commenced, November 12, 2002, I was not and have not since then been either an employee, officer, director, or shareholder of either One Group International, Inc. or Ecommerce Exchange, Inc. or ECurrency Exchange, Inc."[25]

### a. Underlying Policy

■ An individual may not use the Fifth Amendment as both a shield and a sword, answering some questions related to a particular topic in a given proceeding and avoiding others, as dictated by whim or self-interest.[26] When a party testifies voluntarily, and therefore controls the extent of disclosure, "[t]he privilege is waived for the matters to which the witness testifies, and the scope of the 'waiver is determined

---

**23.** "If the court determines that the incriminatory nature is not readily apparent, the witness then must endeavor to explain how his answer will be incriminatory." *Edgerton*, 734 F.2d at 919. Johnson may request *in camera* review to bolster his invocation of the Fifth Amendment.

**24.** Matus Letter, Dec. 20, 2002, Ex. C, at 3.

**25.** Johnson Aff., Jan. 15, 2002, ¶ 3.

**26.** *E.g., Mitchell,* 526 U.S. at 321, 119 S.Ct. 1307.

by the scope of relevant cross-examination.' " [27] "[A] contrary rule 'would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony.' " [28]

*Brown v. United States* [29] illustrates the principle. There, an individual testified voluntarily on her own behalf in a denaturalization proceeding but then invoked the privilege and refused to answer questions on cross-examination that related to matters covered on direct examination. The witness insisted that she had not waived because she had not given any incriminating testimony on direct examination. The trial court disagreed and directed the witness to answer the relevant questions. The witness refused and was adjudged guilty of criminal contempt. The Supreme Court affirmed the conviction. [30] It reasoned that allowing a witness to testify on potentially self-incriminatory matters and then avoid relevant cross-examination "would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell." [31]

### b. Test for Inferring a Waiver

█ The Supreme Court has admonished that "courts must 'indulge every rea-sonable presumption against waiver....' " [32] This Circuit therefore has adopted a two-pronged test for inferring a testimonial waiver of the privilege against self-incrimination. The first prong requires that "the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth." [33] The second prong requires that "the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination." [34]

### i. Distorted Truth

The distorted-truth prong reflects the gravity of inferring a testimonial waiver: "[F]ailure to find a waiver would prejudice a party to the litigation." [35] The key question is "whether the witness' prior testimony has created a significant danger of distortion." [36] As Judge Learned Hand stated, the privilege against self-incrimination " 'should not furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition. The time for a witness to protect himself is when the decision is first presented to him; ... anything more puts a mischievous instrument at his disposal.' " [37]

27. *Id.* (quoting *Brown v. United States*, 356 U.S. 148, 154–55, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958)). It is axiomatic that "[d]isclosure of a fact waives the privilege as to details." *Rogers v. United States*, 340 U.S. 367, 373, 71 S.Ct. 438, 95 L.Ed. 344 (1951). The waiver as to testimonial admissions extends also to any "documentary admissions on the same subject matter." *In re Donald Sheldon & Co.*, 93 F.Supp.2d 503, 504 (S.D.N.Y.2000).

28. *Mitchell*, 526 U.S. at 322, 119 S.Ct. 1307 (quoting *Rogers*, 340 U.S. at 371, 71 S.Ct. 438).

29. 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589.

30. *Id.* at 157, 78 S.Ct. 622.

31. *Id.* at 155–56, 78 S.Ct. 622.

32. *Emspak v. United States*, 349 U.S. 190, 198, 75 S.Ct. 687, 99 L.Ed. 997 (1955) (footnote omitted) (citing cases).

33. *Klein v. Harris*, 667 F.2d 274, 287 (2d Cir.1981).

34. *Id.*

35. *Id.* at 288.

36. *Id.*

37. *Id.* (quoting *United States v. St. Pierre*, 132 F.2d 837, 840 (2d Cir.1942)).

This case satisfies *Klein's* first prong, as Johnson's affidavit, if allowed to stand without cross-examination, would be likely to leave the finder of fact with a "distorted view of the truth." A key issue in this case is Johnson's relationship to the core defendant entities, determination of which promises to be a difficult task given the muddy field of evidence. The affidavit asserts that Johnson was not an agent or employee of the core defendant entities at the time of filing this suit or subsequently. Preventing plaintiffs from challenging Johnson's assertion therefore would be highly prejudicial.

#### ii. Reason to Know

The reason-to-know prong also reflects the severity of inferring a waiver. In order for a witness reasonably to have known that his or her statements would constitute a waiver, the statements must have been: "(a) 'testimonial,' meaning that they were voluntarily made under oath in the context of the same judicial proceeding, and (b) 'incriminating,' meaning that they did not merely deal with matters 'collateral' to the events surrounding the commission of the crime, but directly inculpated the witness on the charges at issue." [38]

Johnson's affidavit was testimonial within the meaning of *Klein*. He voluntarily submitted the affidavit, which was a statement made under oath, and the deposition questions in response to which he invoked the Fifth Amendment occurred in the same judicial proceeding as the one in which he submitted the affidavit.

The second requirement under *Klein's* reason-to-know prong is that the statement have been incriminating, meaning that it: (1) was not on a collateral matter, and (2) inculpated the witness. The nature of Johnson's connection to the core defendant entities clearly is not collateral. It goes to the heart of his possible involvement in the alleged fraud. The more difficult question is whether, within the intendment of *Klein*, the affidavit "directly inculpated" Johnson. [39]

At first glance, of course, it is difficult to see how the affidavit could satisfy that requirement, as it merely disavows any present connection with certain of the entities in question. But a more careful examination yields a very different conclusion.

To begin with, to construe *Klein* as permitting an inference of waiver only if the testimony upon which the inference is to be based itself tended to show, or provide a link useful in showing, that the witness is guilty of a crime would not attribute much common sense to the decision. It would permit a finding of waiver only where the witness voluntarily suggests the witness's own guilt but disallow such a finding precisely where it is most justified—i.e., where the witness has exculpated him- or herself and then used the privilege to avoid cross-examination or other efforts to test the witness's assertions. Moreover, *Klein's* citation of *Sigety v. Abrams* [40] and *United States v. James* [41] in this connection demonstrates that no such construction was intended.

In *Sigety*, the Circuit affirmed denial of habeas relief to a petitioner who had testified under compulsion after the trial court had found that the privilege against self-incrimination did not apply. [42] It agreed with the trial court that the compelled testimony did not incriminate the petition-

---

**38.** *Id.* (internal citations omitted).

**39.** *See id.*

**40.** 632 F.2d 969 (2d Cir.1980).

**41.** 609 F.2d 36 (2d Cir.1979).

**42.** *Sigety*, 632 F.2d at 973.

er, so the compulsion to answer certain questions did not violate the petitioner's privilege against self-incrimination.[43] Thus, the *Sigety* panel's concern was only with the question of whether the defendant had a right to invoke the privilege, which depended only on whether an answer might have led to inculpatory evidence.

*James* is to similar effect. In that case, a witness for the state gave direct testimony that directly implicated the defendant and acknowledged that he, the witness, was under indictment in North Carolina.[44] On cross-examination, however, the witness invoked the privilege to avoid answering questions pertinent to the pending indictment. But the Court of Appeals upheld the conviction, holding that the direct testimony had not waived the witness's privilege as to matters related to the pending indictment because the witness's direct examination "disclosed nothing that might be characterized as incriminating." [45]

When *Klein* is viewed against this background, it comes into sharper focus. Testimony is "incriminating" in the sense required to ground an inference of waiver when, "by virtue of [its] 'incriminating' nature, [it] contain[s] information that the witness was privileged not to reveal." [46] In other words, the pivotal attribute of "incriminating" testimony, as *Klein* used the word, is the witness's ability to have invoked the privilege, not whether the testimony given actually harmed the witness.

The question of Johnson's relationship to the entities in issue is a matter of obvious prosecutorial concern. As a general proposition, Johnson therefore has a right to assert the privilege with respect to any inquiry into that subject. His affidavit therefore was incriminating in the sense that he there gave information which could not have been compelled over his privilege against self-incrimination. That is all that is required for a finding of waiver by the making of a voluntary statement under oath. In consequence, Johnson's affidavit waived the privilege with respect to questions concerning his relationships with these entities.

In addition to satisfying *Klein's* requirements, the finding of a waiver in this instance alleviates the policy concerns articulated in *Brown*. Here, as in *Brown*, Johnson is a party to this lawsuit and voluntarily testified. He submitted the affidavit in an effort to strengthen his legal position while consciously seeking to limit the scope of his disclosure. But as the *Brown* Court concluded, a witness may not offer such testimony and yet "claim the right to be free from cross-examination on matters raised by her own testimony on direct examination." [47] This would make a mockery of the Fifth Amendment and frustrate efforts to achieve a just result. *Brown's* reasoning applies to Johnson's situation just as it "applies to [that of] a witness in any proceeding who voluntarily takes the stand and offers testimony in his own behalf." [48]

In sum, Johnson waived his privilege against self-incrimination with regard to matters relevant to his affidavit. The attached appendix applies these principles to the specific questions at issue here. These same principles apply also to any new

43. *Id.*

44. *James,* 609 F.2d at 43–44.

45. *Id.* at 45.

46. *Klein,* 667 F.2d at 288. In addition, *Klein* underscores that by their "testimonial" na-

ture, statements "will likely influence the finder of fact." *Id.*

47. *Brown,* 356 U.S. at 156, 78 S.Ct. 622.

48. *Id.* at 155.

questions that plaintiffs ask Johnson in their future examination of him.

## B. Corporate Records

The Court turns next to plaintiff's request for an order requiring Johnson to produce certain corporate records that may be in his possession.[49]

■■■ As an initial matter, the content of business records created on a voluntary basis is not subject to Fifth Amendment protection,[50] and the privilege protects individuals but not collective entities.[51] If Johnson remains an employee or agent of any corporate entity for which he currently holds responsive documents, therefore, the Fifth Amendment does not shield their production. But if Johnson is no longer an agent of the corporate entities, the dispositive question would be whether the act of production itself would constitute self-incriminating testimony,[52] as the act of compelled production "has communicative aspects of its own, wholly aside from the contents of the papers produced."[53] Among other things, the act can reveal an individual's knowledge that a document exists, an individual's control of that document, and the individual's belief that the document meets the specifications described in the request for production.[54]

The Court will be in a better position to resolve this dispute after plaintiffs further depose Johnson as ordered by the Court. On the basis of a fuller record, the Court then will consider any request by plaintiffs to order Johnson to produce corporate documents.

## Conclusion

The parties are directed to agree upon a time and place for the continued deposition of Johnson. In keeping with the specific dispositions in the attached appendix and the broader principles articulated in this opinion, Johnson need not answer questions that clearly implicate his privilege against self-incrimination. But Johnson must answer other questions, where the danger of self-incrimination is less apparent, unless the Court directs otherwise after considering any future evidence submitted by Johnson that specifically addresses why a particular question implicates his privilege against self-incrimination. In addition, Johnson must submit to examination concerning his relationship to the relevant entities in light of his limited waiver of self-incrimination and likewise must produce any related documents. After plaintiffs have deposed Johnson as prescribed in this opinion, the Court will accept any

---

**49.** Plaintiffs do not now contend that Johnson's invocation of the Fifth Amendment to avoid production of personal records was improper.

**50.** E.g., Braswell v. United States, 487 U.S. 99, 102, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988) ("There is no question but that the contents of subpoenaed business records are not privileged."); United States v. Doe, 465 U.S. 605, 608–09, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); Fisher v. United States, 425 U.S. 391, 400–01, 409–10, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

**51.** E.g., Braswell, 487 U.S. at 102, 108 S.Ct. 2284 ("[I]t is well established that such artifi-

cial entities are not protected by the Fifth Amendment."); accord In re Grand Jury Subpoenas Dated Oct. 22, 1991, and Nov. 1, 1991, 959 F.2d 1158, 1163 (2d Cir.1992); Terry, 886 F.2d at 1356; see also Braswell, 487 U.S. at 104–08, 108 S.Ct. 2284 (reviewing the development of the collective entity doctrine).

**52.** E.g., Doe, 465 U.S. at 611–12, 104 S.Ct. 1237 (construing the act of production privilege in respect to a sole proprietorship).

**53.** Fisher, 425 U.S. at 410, 96 S.Ct. 1569.

**54.** E.g., id.; DG Acquisition Corp., 151 F.3d at 79.

appropriate motions with respect to the production of corporate documents.

SO ORDERED.

## *APPENDIX*
### *Disposition Regarding Deposition Questions* [55]

| Disposition | Question |
| --- | --- |
| Johnson is directed to answer each of these questions. | **Background**<br>• (1) whether he owns or rents his home;<br>• (2) how long he has lived at his current address;<br>• (3) whether he lives with others;<br>• (13) whether he sees his name on the list of defendants;<br>• (14) which lawyer advised him to invoke the privilege against self-incrimination;<br>• (15) his social security number;<br>• (16) whether he has a passport;<br>• (17) whether he is aware that there is an order from a United States District Court that he is not allowed to dissipate or transfer assets;<br>• (18) whether he owns a computer;<br>• (23) where he banks.<br>**Document production**<br>• (4) whether he searched for any documents requested by plaintiffs;<br>• (8) whether he looked for responsive documents of the core defendant companies;<br>• (9) whether he holds any documents in a representative capacity (i.e., as an officer, director, or shareholder); Relationship to core defendant companies<br>• (5) whether he remains an officer or shareholder of any of the defendants in this case;<br>• (6) whether he is a ten percent shareholder in Ecommerce Exchange; and<br>• (12) whether he is familiar with any of the [corporations] named on the list of defendants presented to him.[56] |
| Johnson need not answer these questions. | **Document production**<br>• (7) whether he has access to Ecommerce Exchange documents;<br>**Knowledge of other defendants and the alleged fraud**<br>• (10) whether he knows David Reed;<br>• (11) whether he knows Frank Zuchristian;<br>• (12) whether he is familiar with any of the [individuals] named on the list of defendants presented to him;<br>• (21) whether he ever has spoken to Rick Young or other defendants;<br>• (22) where Mr. Reed keeps his money and where the money deposited into OSGold currently is located;<br>**Computer access** |

55. These numbers correspond to those in the earlier footnote detailing the questions that Johnson declined to answer on Fifth Amendment grounds. *See supra* note 8.

56. It is not clear form the deposition transcript whether this question pertained to corporate or individual defendants. Johnson must answer with respect to the former but not the latter.

- (19) whether he has access to a particular computer, or has access to computers owned, controlled or utilized by other defendants;
- (20) whether he has access to any of the databases;

**Relationship to other entities**

- (24) what companies he owns or controls;
- (27) whether he and Mr. Zuchristian own "card accounts TV;"

**Terminology**

- (25) what is "EGold";  and
- (26) what are "Randy's books."