OSRECOVERY, INC., et al., Plaintiffs,

v.

ONE GROUPE INTERNATIONAL, INC., et al., Defendants.

No. 02 Civ. 8993(LAK).

United States District Court, S.D. New York.

Feb. 25, 2004.

Wayne C. Matus, A. John P. Mancini, LeBoeuf, Lamb, Greene & MacRae L.L.P., for Plaintiffs.

Chaim A. Levin, Freedman & Stone, Attorneys for Defendants Ecommerce, Inc., Pinnacle Dynamics, LLC, Gaithman's Gold Nation, International Negotiations Team, James Shupperd, Eric Gaither, and Rick Young, Edward F. Westfield, Jr., for Defendant Randy L. Johnson, Jr.

Lawrence W. Newman, James M. Torre, Baker & McKenzie, for Defendant Latvian Economic Commercial Bank.

Paul W. Verner, Verner, Simon, P.C., for Defendant Parex Bank.

## MEMORANDUM OPINION

KAPLAN, J.

The second amended complaint (the "Complaint" or "Cpt") in this civil RICO and securities fraud action alleges that defendants, led by One Groupe International, Inc. ("One Groupe"), were involved in a fraudulent operation consisting initially of the sale of non-existent, supposedly gold-backed "electronic currency" and then by a mammoth Ponzi scheme—a guaranteed high-yield investment program that resulted in losses of investments once estimated to be worth more than $250 million. The matter is before the Court on plaintiffs' motion for a preliminary injunction and other relief.

### I. Facts

#### A. The Complaint

The initial plaintiff in this action, OSRecovery, Inc., is a New York corporation that purports to represent the interests of approximately 3,400 individuals who were account holders or investors in the allegedly fraudulent scheme described in the Complaint. More than 2,000 individual alleged investors have joined as plaintiffs in subsequent amended complaints.

The Complaint alleges that defendants David C. Reed and Randy L. Johnson, Jr., and a number of entities controlled by them [1] carried out a scheme to defraud investors which involved two elements. The first was the sale to investors of so-

called electronic currency, or "e-currency," accounts denominated in "OSGold," the balances of which supposedly were (i) 100 percent backed by gold bullion, (ii) usable to purchase goods and services on the Internet, and (iii) accessible with a debit card. The second was the sale to investors, for OSGold, of high-yield investment programs known as "OSOpps," which promised investors returns of 30 percent per month on three-month and 45 percent per month on twelve-month investments as well as the guaranteed return of principal on maturity. The OSGold, according to the Complaint, was not gold-backed or convertible into gold, as the defendants represented. The OSOpps investment programs, it asserts, were simply a Ponzi scheme that paid the promised returns for a brief period from capital put up by new investors and then collapsed. In any case, the Complaint asserts, the entire operation ceased without explanation in mid–2002, leaving the investors holding the bag.[2]

Reed, Johnson, and their entities (collectively, the "One Groupe Defendants") are not the only defendants in the action. The Complaint alleges that they acted together with a number of so-called Exchange Makers—entities that purport to convert hard currencies into e-currency—including Ecommerce Exchange, Inc.; Pinnacle Dynamics, LLC d/b/a FastGold, and its owner, James Shupperd; GoldNow Corp. and its owner, Graham Kelly; Euro Gold Line and its owner, Frank Zuchristian; Gaithman's Gold Nation Ltd. and its owner, Eric Gaither; and Gold–Today and its owner, Michael Moore.[3] Plaintiff sues as well the Latvian Economic Commercial Bank ("Lateko") and Parex Bank ("Parex"), both organized in Latvia, which al-

---

1. One Groupe International, Inc. ("One Groupe"), OSGold.com, OSOpps.com, and Ecurrency Exchange, Inc. ("Ecurrency").

2. Cpt. ¶¶ 1–4, 8, 10–11, 26–29, 45.

3. Id. ¶¶ 7, 30–41, 68, 89–144.

legedly played a role in the debit card aspect of the scheme;[4] International Negotiations Team ("INT") and its principal, Rick Young, which supposedly are attempting to negotiate with the One Groupe Defendants on behalf of defrauded investors;[5] and Pecunix, Inc. ("Pecunix"), which is said to be a reincarnation of the One Groupe Defendants or, at least, their allegedly fraudulent operation.[6]

The Complaint contains twelve claims for relief:

| Number | Defendants [7] | Brief Summary of Claim |
|---|---|---|
| 1 | All *except* Lateko, Parex, INT & Young | Misrepresentation that OSGold gold-backed and failure to disclose that OS Opps was a Ponzi scheme in violation of § 10(b) of the Exchange Act and Rule 10b–5 |
| 2 | All defendants | Civil RICO violations—18 U.S.C. § 1962 |
| 3 | All defendants | Common law fraud |
| 4 | All defendants | Aiding and abetting common law fraud |
| 5 | All defendants | Negligent misrepresentation |
| 6 | All defendants | Breach of fiduciary duty |
| 7 | One Groupe, OSGold, OSOpps, Reed, Johnson, Ecurrency, INT, Young | Conversion |
| 8 | One Groupe, OSGold, OSOpps | Account stated |
| 9 | One Groupe, OS Gold, OSOpps, Reed, Johnson, Ecurrency, GoldNow, Kelly, Young, INT | N.Y. GEN. BUS. L. § 349(a) |
| 10 | Ecurrency, GoldNow, Gaithmans, Gold Today | Breach of contract |
| 11 | All defendants *except* Lateko, Parex and Pecunix | Unjust enrichment |
| 12 | All defendants | Constructive trust |

### B. The Motion

At the outset of this case, plaintiff presented an order to show cause seeking a temporary restraining order and a preliminary injunction, among other relief. The Court granted a temporary restraining order freezing assets of the One Groupe Defendants and restraining them from destroying, altering or otherwise tampering with records relating to their business practices, in each case pending the hearing of the preliminary injunction motion.[8] None of the defendants timely filed papers in opposition to or appeared at the hearing on the motion for a preliminary injunction and an order of attachment.[9] The Court then extended the temporary restraining order, allowed Parex and the Exchange Makers to submit additional papers, and granted an application for expedited discovery.[10]

### C. The Fraud

As the One Groupe Defendants, save for Johnson, have not appeared in this action and as Johnson has not opposed the motion, the crux of plaintiffs' showing is unre-

---

4. *Id.* ¶¶ 31–32, 77–88.

5. *Id.* ¶¶ 42–43, 146–62.

6. *Id.* ¶¶ 163–73.

7. The Complaint names unidentified "Doe" defendants who are ignored in this table.

8. Order, Nov. 12, 2002.

9. Counsel for some of the Exchange Makers and Parex were present.

10. Tr., Nov. 15, 2002, at 30–31. The initial extension was for ten days. *Id.* The TRO subsequently was extended pending determination of this motion. Orders, Dec. 2, 2002 (docket item 13), Dec. 12, 2002 (docket item 35).

butted.[11] Accordingly, the Court will set out its findings with respect to the core of plaintiffs' claims.[12]

### 1. The One Groupe Defendants' Fraudulent Scheme

The first part of the One Groupe Defendants' scheme involved what purported to be a gold-backed Internet currency system called OSGold. They ran an Internet web site—*www.osgold.com*—which described OSGold as "an online monetary system." A user supposedly purchased "gold" by paying hard currency to a One Groupe-approved "Exchange Service Provider." The "gold" thus purchased, less a fee, was credited to the user's OSGold account with One Groupe. According to the One Groupe Defendants, the balances were 100 percent backed by gold bullion. The user then was given an anonymous debit card by means of which the user could spend his or her OSGold, convert it into cash, or transfer it to other OSGold accounts.[13]

Following the launch of OSGold, the One Groupe Defendants began offering for sale interests in purportedly high-yielding investment programs called OSOpps, upon which they *guaranteed* returns of 30 percent per month on three-month and 45 percent per month on twelve-month investments as well as the return of the entire principal at the conclusion of the investment term.[14] Investments in OSOpps were to be made with OSGold or another so-called "e-currency" known as e-gold through another web site operated by the One Groupe Defendants, *www.osopps.com.*

In fact, it appears that the entire operation, as alleged, was a Ponzi scheme. The OSGold accounts never were backed, in whole or in part, by gold bullion. There appear never to have been any investments underlying the so-called OSOpps. Money paid for OSGold accounts and OSOpps appears to have been used to pay some returns to early OSOpps investors and otherwise misappropriated.[15] Then, in mid–2002, the OneGroupe Defendants abruptly—and without explanation—suspended operations, leaving plaintiffs and others with no means of getting back any of the money they put into the scheme.[16]

The Court finds that plaintiffs are likely to establish that the entire One Groupe—OSGold—OSOpps operation was a thorough-going fraud from beginning to end. Specifically, they are likely to prove that OSGold accounts never were backed by

**11.** Johnson declined on Fifth Amendment grounds to answer most questions put to him in his deposition. *See OSRecovery, Inc. v. One Groupe Int'l, Inc.,* 262 F.Supp.2d 302 (S.D.N.Y.2003).

**12.** Findings on a motion for provisional relief are inherently tentative and subject to revision in light of evidence presented in later stages of the case.

**13.** Benoit Aff. ¶ 13; Van Winkle Aff. ¶¶ 15–18; Zuchristian Aff. ¶¶ 14, 16–17.

On November 15, 2002, the Court received a fax, purportedly from Mr. Zuchristian, that bore a fax transmission line purporting to indicate that the fax had been sent from the Reval Hotel Latvia. The fax claimed that Zuchristian "was made to sign an affidavit [presumably that submitted by plaintiffs] by Hill & Associates under false pretenses," although it did not assert that the affidavit was inaccurate. The fax included also what purported to be a copy of an e-mail from Zuchristian to plaintiffs' counsel with what appear to be comments on a draft of the Complaint. In view of the fact that this fax is unsworn, unauthenticated, and not submitted by any party to the litigation, the Court disregards it in considering this motion.

**14.** Benoit Aff. ¶¶ 9–11; Van Winkle Aff. ¶ 20; Zuchristian Aff. ¶ 7.

**15.** *See, e.g.,* Zuchristian Aff. ¶ 11; Utley Aff. ¶ 17.

**16.** *See* Benoit Aff. ¶ 16; Van Winkle Aff. ¶¶ 30, 35; Zuchristian Aff. ¶¶ 10, 13.

gold, that the One Groupe defendants misappropriated funds placed in OSGold accounts, that the OSOpps investment opportunities were non-existent, a Ponzi scheme and certainly never likely to pay any investment return, and that the One Groupe Defendants all knew it and acted with intent to defraud. Moreover, they are likely to establish that Reed holds substantial proceeds from the fraud in offshore accounts in Latvia, Panama, Mexico and Hong Kong.[17]

### 2. The Exchange Makers

In contrast to the One Groupe Defendants, three of the Exchange Makers— Gaithman's Gold Nation Ltd. and its owner, Eric Gaither, Pinnacle Dynamics, LLC d/b/a FastGold, and its owner, James Shupperd; and Ecommerce Exchange, Inc.—profess innocence of any fraudulent intent.

Mr. Gaither of Gaithmans Gold Nation asserts that he never met any of the One Groupe Defendants. He acknowledges that his business bought OSGold from the One Groupe Defendants for his customers. But he denies any knowledge of or involvement with OSOpps and contends that his role "was solely to facilitate the exchange in digital currency [his] customers were interested in, including (on occasion) OSGold, the digital currency, but not OSOpps, the investment vehicle." [18]

Mr. Ortega of Ecommerce Exchange, Inc., relates that he and his partners bought the business from defendant Johnson and another after OSGold and OSOpps were out of operation. While the purchase agreement is not entirely clear, it arguably transferred both the "company and its assets" to the buyers.[19]

Finally, James Shupperd of Pinnacle Dynamics, LLC, acknowledges involvement with Reed pursuant to which he took over the FastGold website in or about late 2000. For a brief period, FastGold was the exclusive site for exchanging OSGold. In time, however, Reed set up Ecommerce Exchange and began competing with FastGold as a result of which the latter's profits declined. Mr. Shupperd then learned about OSOpps and himself invested over $150,000 in it although, he says, he had nothing to do with OSOpps and never knew precisely what investments it supposedly was involved in. Still later, he was approached, he says, by principals of OS-Recovery, who asked him to exchange approximately $3.5 million for OSGold which, in due course, he did. When he learned in the summer of 2002 that OSGold was having financial difficulties, he states that he suspended trading in OSGold on his web site. He says that he lost the $150,000 that he put into OSOpps and $33,000 in OSGold.[20]

Plaintiffs have not sought to refute any of these assertions.

### 3. INT and Young

International Negotiation Team ("INT") and its principal, Rick Young, are another matter.

In the late spring of 2002, as the One Groupe scheme was unraveling, the One Groupe Defendants recognized that investors soon would seek to recover their money. They posted a notice online to the effect that they were working with INT, a purportedly independent negotiation team, to handle claims. Despite the supposed

---

**17.** Zuchristian Aff. ¶¶ 22–27; Am. Mancini Aff. ¶ 6 & Ex. 3; Utley Aff. ¶¶ 24, 36.

**18.** Gaither Decl. ¶¶ 16–20.

**19.** Ortega Aff. *passim* & Ex. A.

**20.** Shupperd Decl. *passim*.

independence of INT, at least some of its various Internet postings to investors came from Reed.[21] Moreover, INT discouraged claimants from alerting authorities to these events, claiming that "no one has a chance in hell of ever getting a dime" if reports were made.[22] Some time later, INT indicated that One Groupe's failures were due in part to poor investments. Plaintiffs therefore claim that INT and Young engaged in a corrupt effort to stall and to prevent claimants from suing or going to authorities as a means of aiding Reed and others to get away with their ill-gotten gains.

Young denies this in a declaration that purports to account for his involvement in this matter. He claims that he invested and lost money in OSOpps and did not know Reed at the outset. When Reed terminated the operation, a number of other investors, including Vicky Benoit, contacted him, told him that they had lost money in the OSOpps and OSGold ventures, and advised him that they believed that Reed had left the country with the money. He claims that "plaintiff" then asked him to attempt to find Reed and his assets, although it is far from clear, given the full context of Young's declaration, that "plaintiff" as used in the declaration means OSRecovery as distinguished from one or more individuals who claim to have lost money and who Young believes are connected with OSRecovery.

In due course, Young claims to have located Reed in Cancun, Mexico, and so advised "plaintiff." Before providing any additional information, he demanded a retainer and a fee. He was paid $5,000 by one Robert McLean. Young's declaration then recites that it annexes "a copy of an e-mail confirming that [Young] was hired by persons who [he] believe[s] to be representatives of the plaintiff to find David Reed," but no such document in fact is attached to the declaration.[23] In any case, Young claims that he then engaged in further research and conversations with Reed and concluded that Reed did not have substantial assets.[24]

At this point, the story becomes even stranger. Young says that his initial clients declined his offer to continue negotiations with Reed, which is not surprising in view of his advice that Reed probably did not have substantial assets. Undeterred by his view that there was little or nothing to recover, Young then decided to offer his services to others and set up a web site for that purpose.[25] He claims that 8,650 claimants have authorized exclusively him to seek to recover funds on their behalf.[26] He claims to have negotiated an agreement with Reed "to transfer funds on a periodic basis" and set up a network to transfer those funds to his clients [27] but no evidence of any such agreement, payments or transfers has been provided. Nonetheless, Young expresses great umbrage at plaintiffs on the theory that the litigation is thwarting his efforts to recovery anything.[28] In essence, he claims that OSRecovery is his competi-

21. Am. Mancini Aff. ¶ 18 & Ex. 5, first page.

22. Benoit Supp. Aff. ¶ 5 & Ex. D, fourth page.

23. Young Decl. ¶ 8.
One wonders what disclosure he made of his view that Reed lacked substantial assets, which presumably would be material to one deciding whether to hire him.

24. Id. ¶¶ 9–10.

25. Id. ¶¶ 11–13.

26. Id. ¶ 13.

27. Id. ¶ 14.

28. Id. ¶¶ 14–15.

tor and that it has named him in this action, without good reason, simply to place him at a competitive disadvantage.

The truth concerning Young and INT is not self evident. There is no evidence that he was part of the OSGold and OSOpps fraud at the outset. And it may be, as he claims, that he is nothing more than an innocent competitor of OSRecovery who genuinely believes that litigation and the involvement of law enforcement are counterproductive in obtaining any recovery for the defrauded investors. On the other hand, his efforts to prevent the involvement of law enforcement and courts, and to stall investors, certainly served the interests of the fraudsters. Moreover, his own story is improbable. Why would Reed, if he absconded to Mexico with the investors' money, ever enter into an agreement with Young—of the existence of which Young has offered no tangible evidence—to make periodic payments at all, much less through Reed?[29] And this becomes all the more unlikely given Young's conclusion that the money is gone and that Reed no longer has substantial assets.

In the last analysis, the circumstantial evidence is sufficient, Young's denials notwithstanding, to warrant a finding that plaintiffs, at least at this preliminary stage, are likely to demonstrate that Young and INT joined the scheme in its later stages and thus are likely to prevail on the merits against them.

### 4. The Banks

The role of Lateko and Parex in these events revolves around their alleged role in providing the anonymous debit cards that were used to attract investors in OSGold and OSOpps and to facilitate the investors' financial activities.

According to Mr. Zuchristian, he and Reed entered into a partnership after February 2001 to form Card Accounts, which provided anonymous debit cards that permitted their holders to withdraw hard currency from any ATM machine in the world that participated in the CIRRUS system.[30] Card Accounts initially issued 2,500 such cards to OSGold account holders using a master account at Lateko set up in Zuchristian's name.[31] Within that master account were individual sub-accounts to which each anonymous debit card corresponded. In order for the holder to withdraw from a sub-account, Zuchristian first had to allocate funds to the relevant sub-account.[32] In or about March 2002, when OSGold began to falter, Reed abandoned Card Accounts. Shortly thereafter, Zuchristian "relocated the company to Euro Gold Line."[33] Subsequently, it appears that the debit cards became inoperative.[34]

The Complaint alleges that Parex performed essentially the same role as Lateko at an earlier date.[35] The evidence with respect to Parex, however, shows only that one OSOpps investor obtained an anonymous debit card from Parex in an envelope bearing the name and return address of

---

**29.** If Reed and other fraudsters, as Young claims, are willing to make payments, it would appear to be much to their advantage to do so in the context of settling individual or class litigation, a vehicle through which they could obtain releases and other protection against further suit. Young has offered no reason to believe that he could deliver any such protection.

**30.** Zuchristian Aff. ¶ 14.

**31.** *Id.* ¶ 16.

**32.** *Id.*

**33.** *Id.* ¶ 15.

**34.** Benoit Aff. ¶¶ 14–15.

**35.** Cpt. ¶¶ 86–88.

Ecommerce Exchange, Reed's company.[36]

## II. Discussion

### A. Preliminary Injunction

The principal injunctive relief that plaintiffs seek, if granted, would enjoin:

1. The One Groupe Defendants from selling or offering for sale OSGold and OSOpps and from transferring or dissipating their assets, and

2. The Exchange Makers and the banks from transferring or dissipating any assets of any of the One Groupe Defendants that are in their hands.[37]

There is neither opposition to nor reason to deny an order barring the One Groupe Defendants and the Exchange Makers[38] from selling or offering for sale OSGold and OSOpps, although that activity appears already to have ceased.[39] The proposed asset freeze order, however, is a different matter.

The stated purpose of the freeze order aspect of the preliminary injunction is "to prevent [defendants] from disposing of, transferring or assigning their assets."[40] Plaintiffs claim that they are threatened with irreparable injury should such transfers occur in that "defendant's [sic] conduct threatens to frustrate a potential money judgment."[41] But this prayer for relief encounters a fundamental problem on which the parties' papers are entirely silent.

■ In *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,[42] the Supreme Court held that a federal court does not have the power, in the exercise of its general equitable jurisdiction, to issue a preliminary injunction in an action for money damages to prevent a defendant from transferring assets in which the plaintiff claims no lien or equitable interest. The New York Court of Appeals reaffirmed the same principle, as a matter of New York law, a year later in *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*.[43] Accordingly, the freeze order that plaintiffs seek is impermissible as a matter

---

**36.** Benoit Supp. Aff. ¶ 4 & Ex. C.

**37.** Plaintiffs seek a grab bag of other purported injunctive relief such as an accounting and disclosure of various sorts of information. These matters are better dealt with in discovery.

**38.** Even if the Exchange Makers initially were not culpable participants in the scheme, the evidence adduced here probably would render any further sales efforts by them fraudulent.

**39.** The voluntary cessation of challenged conduct does not moot the application for injunctive relief. *E.g., United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

**40.** Pl. Mem. 22.

**41.** *Id.* 23.

**42.** 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

**43.** 94 N.Y.2d 541, 708 N.Y.S.2d 26, 729 N.E.2d 683 (2000).

*Grupo Mexicano* and *Credit Agricole* leave open the possibility that orders freezing particular assets may be appropriate where, among other things, such relief is appropriate in aid of a court's ability to render equitable relief as, for example, where a plaintiff seeking specific performance of a contract to convey real property seeks a preliminary injunction to prevent the defendant from selling the property to another. Apart from a conclusory statement in their memorandum to the effect that they believe that defendants' assets may "consist of converted funds from Plaintiffs' OSGold and OSOpps account," Pl. Mem. 22, they have not even alluded to any such theory, let alone adduced evidence to support it. They have not identified any particular assets in which they have shown a likelihood of an equitable lien or claim.

of law.[44]

### B. Order of Attachment

Plaintiffs seek also an order attaching any assets of the One Groupe Defendants that are located in the State of New York.

■ Orders of attachment in federal cases in New York are governed, by virtue of Fed.R.Civ.P. 64, by Article 62 of the New York Civil Practice Law and Rules, Section 6201, which provides in relevant part that such an order is appropriate, in a proper case, where the defendant (a) "is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state," or (b) "with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts."[45] Such relief is proper where the plaintiff has a cause of action, where it is likely to prevail on the merits, and where the amount demanded exceeds all counterclaims known to the plaintiff.[46]

■ The record before the Court establishes that all of the corporate One Groupe Defendants are foreign corporations not qualified to do business in New York, that Reed and Johnson are non-domiciliaries,[47] and that plaintiffs are likely to prevail as against them. They therefore are entitled to an order of attachment with respect to any assets of those defendants in the State of New York.

### Conclusion

For the foregoing reasons, plaintiffs' motion for a preliminary injunction and an order of attachment is granted to the following, and only the following, extent:

1. Defendants other than Parex Bank and Latvian Economic Commercial Bank are enjoined, pending the final determination of this action, from selling or offering for sale any interest in OSGold or OSOpps; and

2. An order of attachment is granted against any assets located in the State of New York of defendants One Groupe International, Inc., OSGold.com, OSOpps.com, and David C. Reed, Randy L. Johnson, Jr., to the extent of $250 million.

The preliminary injunction is conditioned upon plaintiffs posting, on or before March 3, 2004, a bond or other sufficient security in the amount of $5,000. The effectiveness of the order of attachment is conditioned on plaintiffs first giving an undertaking, in accordance with N.Y. CPLR 6212(b), in the amount of $100,000.

The motion is denied in all other respects.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

---

44. This makes it unnecessary to consider whether plaintiffs have demonstrated a likelihood of success on the merits of their many claims against the banks.

45. N.Y. CPLR § 6201, subds. 1, 3 (McKinney 1980).

46. *Id.* 6212(a).

47. Mancini Aff., Nov. 12, 2002, ¶ 9.