**DLJ MORTGAGE CAPITAL, INC., Plaintiff,**

v.

**Thomas KONTOGIANNIS, Georgia Kontogiannis, Lisa DiPinto a/k/a Lisa Kontogiannis a/k/a Lisa Pallatos, Annette Apergis a/k/a Annette Johnson, Chloe Kontogiannis, Adam DiPinto, Elias Apergis, John T. Michael, Michael A. Gallan, Esq., Ted Doumazios, Esq., Thomas F. Cusack, III, Esq., Stephen P. Brown, Esq., Steven A. Martini, Carmine Cuomo, Coastal Capital Corporation, d/b/a The Mortgage Shop d/b/a Clearlight Mortgage, Edgewater Development, Inc., Group Kappa Corp., Loring Estates LLC, Parkview Financial Center, Inc., d/b/a Parkview Financial, Inc., Clear View Abstract LLC, Triumph Abstract LLC, Bond & Walsh Construction Company, Inter-American Mortgage Corp., Corinne Michael, Block 13434 Development LLC, Conat Realty LLC, Plaza Real Estate Holding Inc., and Doe's 1 through 100, inclusive, Defendants.**

**No. 1:08–cv–4607–ENV–RML.**

United States District Court, E.D. New York.

Jan. 20, 2009.

John P. Amato, Hahn & Hessen LLP, Middle Village, NY, Robert Jerome Malatak, Hahn & Hessen LLP, New York, NY, for Plaintiff.

Ronald E. Depetris, Depetris & Bachrach, LLP, Andrew Robert Jones, Raymond Granger, Law Offices of Raymond R. Granger, New York, NY, Diane K. Mendez, Murphy, Bartol & O'Brien LLP, Mineola, NY, Randy Scott Zelin, Randy Scott Zelin P.C., Westbury, NY, for Defendants.

### *MEMORANDUM AND ORDER*

VITALIANO, District Judge.

Plaintiff DLJ Mortgage Capital, Inc. ("DLJ" or the "company") initiated this action against numerous individuals and

business entities on November 13, 2008 by filing a 13–count complaint alleging violations of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") and asserting pendently various state and common law claims. DLJ, a corporation that, among other things, is in the business of purchasing large blocks of mortgage loans, alleges that defendants executed a wide-ranging and complex mortgage fraud scheme that spanned several years and cost the company upwards of $50 million.

Plaintiff seeks relief from more than two-dozen named defendants, which it divides into two groups. First, DLJ sues 22 individuals and corporate entities that it claims were responsible for the mortgage fraud scam and who laundered the proceeds, all in violation of RICO and state law (the "RICO defendants").[1] Second, the company sues an additional four individuals and corporations it alleges fraudulently received real property from some of the RICO defendants as part of efforts by the transferors to hide or otherwise shield assets from their creditors (the "fraudulent transferee defendants").[2]

Presently at issue is plaintiff's request, filed simultaneously with its complaint, for immediate and broad equitable relief to prevent defendants from frustrating the enforcement of any judgment that ultimately may be rendered in plaintiff's favor. DLJ asserts—and numerous defendants contest—that defendants have begun to dissipate their assets in order to thwart a judgment against them and threaten to continue to do so if not restrained. "So as to ensure that assets will be available to satisfy" a judgment on its claims (Pl.'s Mem. in Supp. of Mot. at 1), DLJ moves (1) for an order of attachment under substantive New York law (pursuant to Federal Rule of Civil Procedure 64) against property, including but not limited to certain enumerated real properties, owned by the RICO defendants, and (2) a preliminary injunction under Federal Rule of Civil Procedure 65 restraining the RICO defendants from transferring or disposing of their assets and enjoining the fraudulent transferee defendants from transferring or disposing of certain enumerated real properties.

For the reasons set forth below, the Court denies plaintiff's motion for attachment in its entirety. Plaintiff's motion for a preliminary injunction is also denied, except as to defendant Plaza Real Estate, which is hereby enjoined during the pendency of this litigation from transferring or encumbering certain real properties, identified below. The temporary restraining order entered November 17, 2008 and continued on December 3, 2008 is vacated.

## I. BACKGROUND

### A. The Alleged Mortgage Fraud Scam

Plaintiff alleges that the RICO defendants—which include individuals and com-

---

1. The RICO defendants include Thomas Kontogiannis, Georgia Kontogiannis, Lisa DiPinto, Annette Apergis, Chloe Kontogiannis, Adam DiPinto, Elias Apergis, John Michael, Michael Gallan, Ted Doumazios, Thomas Cusack, III, Stephen Brown, Steven Martini, Carmine Cuomo, Coastal Capital Corporation ("Coastal Capital"), Edgewater Development, Inc. ("Edgewater"), Group Kappa Corp. ("Group Kappa"), Loring Estates LLC ("Loring Estates"), Parkview Financial Center, Inc. ("Parkview"), Clear View Abstract LLC ("Clear View"), Triumph Abstract LLC ("Triumph"), Bond & Walsh Construction Company ("Bond & Walsh"), and InterAmerican Mortgage Corp.

2. The fraudulent transferee defendants include Corinne Michael, Block 13434 Development LLC ("Block 13434 Development"), Conat Realty LLC ("Conat Realty"), and Plaza Real Estate Holding Inc. ("Plaza Real Estate").

panies involved at virtually every stage of the real estate sales and mortgage transactions at issue, including the record owners of many of the subject properties, the alleged straw buyers of those properties, the mortgage originator, two abstract companies and an individual agent for each, two settlement agents, and a real estate appraiser—worked in concert to fake at least 95 real estate sales and mortgage loan transactions (the "fraudulent transactions") and then sell those fake loans to DLJ pursuant to a loan purchase agreement that the company had entered into with defendant Coastal Capital. DLJ claims that the mastermind of the fraud was Thomas Kontogiannis, who purportedly formed the criminal enterprise, comprised of his family members, friends, business associates, and companies under their control, that carried out the mortgage scam.

According to DLJ, the details of the scheme are as follows. First, Georgia Kontogiannis, Chloe Kontogiannis, Adam DiPinto, Elias Apergis, Carmine Cuomo, and others (the "straw buyers")[3] set the scheme in motion by preparing false loan applications in connection with purported purchases of residential property in Queens and Brooklyn, New York. These false applications were submitted to Thomas Kontogiannis, John Michael, or Lisa DiPinto, who allegedly caused Coastal Capital, the RICO defendants' corporate funding vehicle and a company they allegedly controlled, to approve the applications in furtherance of the scheme. Next, DLJ asserts that a sham closing for each of the fraudulent transactions was scheduled. At the closings, Loring Estates, Edgewater,

and Group Kappa (the "selling entities"), the straw buyers, Michael Gallan and Thomas Cusack, III (the "settlement agents"), Steven Martini (a real estate appraiser), and unnamed others executed phony closing documents, including mortgages, notes, deeds, appraisals, and uniform settlement statements. Clear View and Triumph ("the abstract companies") and their agents, Ted Doumazios (of Clear View) and Stephen Brown (of Triumph), aided in the scheme by purposefully neglecting to record the deeds and mortgages that corresponded to the fraudulent transactions. The settlement agents purported to issue checks to pay mortgage and transfer taxes, recording fees, title insurance, and lender fees, but allegedly did not—except in certain instances relating to Coastal Capital's fees—disburse any money because the mortgages and deeds had not, in reality, been recorded. Instead, the settlement agents steered the loan proceeds to the other RICO defendants, while keeping a portion of the money for themselves.

After "closing" the fraudulent transactions, DLJ alleges that the RICO defendants made additional profit by directing Coastal Capital to pass on the underlying mortgages in the secondary-mortgage market to institutions, such as DLJ, with which it had loan purchase agreements. To hide the fact these mortgages had not been recorded, and thus would be worthless to a potential purchaser, the RICO defendants allegedly deceived buyers, including DLJ, by providing loan documentation that indicated that the mortgages had been sent for recording and that all taxes and recording fees had been paid.[4]

---

**3.** Unless otherwise noted, all individuals and entities named in this paragraph are RICO defendants.

**4.** The alleged scheme, obviously, also assumed a failure of diligence by the purchaser—that is, the purchaser would not independently confirm recordation at the County Clerk's office.

DLJ claims that in this fashion, between 2004 and 2006, Coastal Capital sold the company the 95 fraudulent transactions, at a principal balance of approximately $50 million.

DLJ alleges that the mortgage scam continued in two important ways even after it was deceived into purchasing the fraudulent transactions. First, the company asserts that the RICO defendants took further advantage of the fact that they had not recorded the mortgages underlying the fraudulent transactions by reselling some of the underlying properties to third-parties. These resales, which allegedly only added to the RICO defendants' ill-obtained profits, compromised DLJ's position in the chain of title for each of the resold properties. Second, DLJ alleges that the RICO defendants schemed to conceal their activities from the company by causing Group Kappa, Edgewater, and Parkview to make monthly mortgage payments on the fake loans via interstate mail and wire. By maintaining the illusion that the loans were legitimate and performing, DLJ alleges that the RICO defendants were able to insure that the company would not scrutinize the transactions. Indeed, DLJ asserts that it was not until September 2007, 14 months prior to the commencement of this action seeking injunctive relief, when the company's loan servicers stopped receiving mortgage payments on the fraudulent transactions, that DLJ was alerted to the fraud.

**B. Other Proceedings Involving Certain of the RICO Defendants**

On February 23, 2007, in connection with a criminal investigation of former United States Congressman Randall "Duke" Cunningham of California (the "Cunningham investigation"), Thomas Kontogiannis pled guilty to one count of engaging in a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 and subsequently was sentenced to 97 months in prison. As part of the same probe, John Michael, Thomas Kontogiannis's nephew, pled guilty on February 4, 2008 to one count of conspiracy to engage in unlawful monetary transactions in violation of 18 U.S.C. § 371 and one count of making a false statement to a grand jury in violation of 18 U.S.C. § 1001, and later was sentenced to five years probation. Many of DLJ's allegations against the RICO defendants are drawn from admissions made by Thomas Kontogiannis and John Michael, or from documents filed, during the course of these criminal prosecutions in the Southern District of California.

**C. Defendants' Alleged Disposition of Assets**

DLJ alleges that not only have the RICO defendants perpetrated the mortgage fraud scheme, they, with the help of the fraudulent transferee defendants, have begun to dissipate or encumber their assets—or will shortly do so—in order to thwart any judgment that might be rendered against them. DLJ points to several transfers of property that it alleges are suspicious and that, it claims, substantiate its concern that defendants are seeking to frustrate the enforcement of a judgment in the company's favor.

Plaintiff's first example relates to the June 20, 2005 purchase of a home in Glen Head, New York (the "Glen Head property") by Annette Apergis, one of the Kontogiannis daughters. According to DLJ, Annette Apergis paid for the Glen Head property with a $500,000 mortgage from Coastal Capital and approximately $1.74 million cash. DLJ alleges, relying on suppositions made by John Michael in a filing in his criminal prosecution, that the cash

used to fund the purchase came from illegal activities, including the alleged mortgage fraud then being perpetrated against plaintiff. Moreover, and most relevant to plaintiff's argument on the instant motion, Annette Apergis allegedly did not record her new deed or the Coastal Capital mortgage until March 1, 2007—nearly two years after the purchase but only one week after her father pled guilty in the Cunningham investigation. DLJ posits that Apergis delayed recording the Glen Head property to hide it from the government's detection and to avoid further implicating herself in the Cunningham investigation (an investigation in which she has not been charged).

Second and similarly, DLJ alleges that Apergis has "played fast and loose" with two properties she allegedly owns located at 134–20 241st Street (the "134–20 property") and 134–22 241st Street (the "134–22 property") in Rosedale, New York (collectively, the "Rosedale properties"). (Pl.'s Decl. in Further Supp. of Mot. ¶ 12.) According to DLJ, although Apergis purchased the 134–20 property in 2002, she did not record the deed until July 2007, "after her father was sentenced in the Cunningham Scam in an obvious effort to secrete assets from creditors." (*Id.*) Likewise, although Apergis allegedly purchased the 134–22 property in 2003, she did not record that deed until January 2007 in order, says DLJ, to secrete her assets from creditors.

Third, DLJ asserts that John Michael transferred his interest in his home in Massapequa, New York (the "Massapequa property") to his wife, Corinne Michael, under suspicious circumstances. Plaintiff alleges that Michael purchased the Massapequa property in 2002 for $1.2 million, with a $960,000 mortgage to Coastal Capital. DLJ baldly asserts that the Coastal Capital mortgage was never satisfied.

Nevertheless, DLJ claims that on February 1, 2007, around the time he was being prosecuted in connection with the Cunningham investigation, Michael transferred the Massapequa property to his wife for the nominal sum of $10.00. On December 5, 2007, Corinne and John Michael, together as co-borrowers, gave a first mortgage on the Massapequa property to Bank of America for $329,400.

Fourth, DLJ claims that, since September 2008, Elias Apergis, one of the Kontogiannis sons-in-law, caused (1) Loring Estates to transfer three properties located in Brooklyn, New York (the "Loring properties") to fraudulent transferee defendant Plaza Real Estate for nominal consideration, and (2) Group Kappa to transfer three additional properties, located in Springfield Gardens, New York ("the Group Kappa properties"), to Plaza Real Estate. According to DLJ, these six properties correspond to six of the fraudulent transactions that allegedly defrauded the company.

Fifth, DLJ asserts in conclusory fashion that Adam DiPinto, another of the Kontogiannis sons-in-law, and his company, Conat Realty, sold eight properties located in Jamaica, New York (the "Jamaica properties") to, among others, fraudulent transferee defendant Block 13434 Development. Plaintiff asserts without further specification of fact that Block 13434 Development is a shell company and that DiPinto effected these transfers in order to hinder, delay, or defraud plaintiff.

Finally, in a letter submitted to the Court on December 19, 2008, DLJ alleges that Bond & Walsh, a company purportedly controlled by Thomas Kontogiannis, recently conveyed fraudulently a secured claim worth approximately $6 million that it had asserted in an unrelated bankruptcy proceeding in the Southern District of New York (the "Bond & Walsh transac-

tion").[5] According to DLJ, Bond & Walsh sold its allegedly secured claim to a newly created special purpose entity, JM Acquisition I, LLC ("JM Acquisition"), so that the purported asset would be liquid and thus more easily secreted by Thomas Kontogiannis.

## D. Prior Proceedings in this Action

Critical to its shock and awe litigation strategy, plaintiff sought upon the filing of its complaint an order of attachment against property owned by the RICO defendants and the issuance of a preliminary injunction restraining the RICO defendants from transferring or disposing of their assets and enjoining the fraudulent transferee defendants from transferring or disposing of certain enumerated real properties. Plaintiff cited as justification for this relief defendants' allegedly ongoing dissipation of assets that could be used to satisfy a judgment in its favor. Pending a hearing on its application for provisional relief, DLJ also requested a temporary restraining order to prevent defendants from transferring real property. On November 17, 2008, this Court signed DLJ's order to show cause, scheduled a hearing on the order for December 3, 2008, and issued a modified version of plaintiff's temporary restraining order pending the hearing. The modified order enjoined defendants from transferring or encumbering certain enumerated real properties that correspond to the allegedly fraudulent transactions at issue and prohibited the RICO defendants from destroying or otherwise disposing of their business records.

At the conclusion of the December 3 hearing, the Court reserved decision on plaintiff's motion for an order of attachment and preliminary injunction as to all of the appearing defendants except Block 13434 Development LLC, as to which plaintiff's motion was adjourned. The Court continued its previously issued temporary restraining order pending determination of the submitted motion, extended without date the time for the defendants to move or answer and for DLJ to amend its complaint, and noted the motion default of those defendants who had not appeared but for whom proof of service previously had been filed.

## II. DLJ's MOTION FOR AN ORDER OF ATTACHMENT

### A. Legal Standard

▇▇▇ "Prejudgment attachment is a provisional remedy to secure a debt by preliminary levy upon the property of the debtor in order to conserve that property for eventual execution." *Monteleone v. Leverage Group*, No. 08–CV–1986, 2008 WL 4541124, at *6 (E.D.N.Y. Oct. 7, 2008); *Michaels Elec. Supply Corp. v. Trott Elec. Inc.*, 231 A.D.2d 695, 647 N.Y.S.2d 839 (2d Dep't 1996). Federal Rule of Civil Procedure 64 permits federal litigants to seek an order of attachment in the manner provided by the law of the state in which the district court sits. Under New York law, a plaintiff may obtain an order of attachment if it demonstrates that (1) it has stated a claim for a money judgment; (2) it has a probability of success on the merits; (3) the defendant, "with the intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of,

---

**5.** The document on which DLJ relies for this assertion, an affirmation filed by counsel for the creditors committee in the bankruptcy proceeding and attached as Exhibit A to DLJ's December 19, 2008 letter, indicates that Bond & Walsh's secured claim had been in the amount of $5.8 million. (Pl.'s Dec. 19, 2008 letter, Ex. A. ¶ 28.) It appears that the creditors committee disputes both the amount and the purportedly secured character of the claim. (*See, e.g.*, Pl.'s Dec. 19, 2008 letter, Ex. A. ¶¶ 4, 30.)

encumbered, or secreted property, or removed it from the state or is about to do any of these acts," and (4) the amount demanded from the defendant is greater than the amount of all counterclaims known to plaintiff. N.Y. C.P.L.R. §§ 6212(a), 6201(3). "Because attachment is a harsh remedy," these statutory factors "must be strictly construed in favor of those against whom" attachment is sought. *Monteleone*, 2008 WL 4541124, at *6; *see also Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 332 (2d Cir.1983); *Kornblum v. Kornblum*, 34 A.D.3d 748, 828 N.Y.S.2d 404 (2d Dep't 2006).

Here, it is undisputed that DLJ seeks a monetary judgment and that the amount demanded from the defendants is greater than the amount of all counterclaims (of which currently there are none). At issue, then, is whether plaintiff has a probability of success on the merits of its claims and whether defendants have intentionally sought to defraud their creditors or frustrate the enforcement of a judgment in plaintiff's favor by disposing of their assets, or are about to do so.

■ To show a probability of success on the merits, the moving party must demonstrate by affidavit that it is more likely than not that it will succeed on its claims. *New York Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.*, No. 07–CV–8008, 2008 WL 2115225, at *1 (S.D.N.Y. May 16, 2008). While "all legitimate inferences should be drawn in favor of the party seeking attachment," *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F.Supp.2d 482, 485 (S.D.N.Y.2004), the moving party nevertheless must make an evidentiary showing of "proof stronger than that required to establish a prima facie case" in order to satisfy this requirement, *New York Dist. Council of Carpenters Pension Fund*, 2008 WL 2115225, at

*1; *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F.Supp.2d 155, 160 (S.D.N.Y. 2007); *see also* David D. Siegel, *New York Practice* § 316 (4th ed. 2009).

■ To establish the third element for attachment, the plaintiff must prove both that the defendant (1) has assigned, disposed of, encumbered, or secreted property, or removed it from the state, or is about to do any of these acts; and (2) has acted or will act with the intent to defraud creditors or to frustrate the enforcement of a judgment that might be rendered in plaintiff's favor. *Encore Credit Corp. v. LaMattina*, No. 05–CV–5442, 2006 WL 148909, at *3 (E.D.N.Y. Jan. 18, 2006); *see* N.Y. C.P.L.R. § 6201(3). "Removal, assignment, or other disposition of property is not a sufficient ground for attachment; fraudulent intent must be proven, not simply alleged or inferred, and the facts relied upon to prove it must be fully set forth in the moving affidavits." *Encore Credit Corp.*, 2006 WL 148909, at *3; *Abacus Fed. Sav. Bank v. Lim*, 8 A.D.3d 12, 778 N.Y.S.2d 145 (1st Dep't 2004). Because "[f]raud is not lightly inferred," plaintiff's "moving papers must contain evidentiary facts as opposed to conclusions proving the fraud." *Encore Credit Corp.*, 2006 WL 148909, at *3; *Brastex*, 702 F.2d at 331–32; *Societe Generale Alsacienne De Banque, Zurich v. Flemingdon Dev. Corp.*, 118 A.D.2d 769, 772, 500 N.Y.S.2d 278, 281 (2d Dep't 1986). "Affidavits containing allegations raising a mere suspicion of an intent to defraud are insufficient." *Strategic Growth Int'l, Inc. v. RemoteMDx, Inc.*, No. 06–CV–3915, 2008 WL 4179235, at *8 (S.D.N.Y. Sept. 10, 2008); *Mitchell v. Fidelity Borrowing LLC*, 34 A.D.3d 366, 827 N.Y.S.2d 107 (1st Dep't 2006); *Rosenthal v. Rochester Button Co.*, 148 A.D.2d 375, 539 N.Y.S.2d 11 (1st Dep't 1989). Rather, "[i]t must appear that such fraudulent intent really exists in the defendant's mind."

*Encore Credit Corp.*, 2006 WL 148909, at *3; *Computer Strategies, Inc. v. Commodore Bus. Machs., Inc.*, 105 A.D.2d 167, 173, 483 N.Y.S.2d 716, 722 (2d Dep't 1984).

██ Because "fraudulent intent is rarely susceptible to direct proof," *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir.1983), district courts in the Second Circuit have examined whether allegedly suspicious transactions exhibit "badges of fraud" that give rise to a sufficient inference of intent. *See, e.g., New York Dist. Council of Carpenters Pension Fund*, 2008 WL 2115225, at *4–5 (citing *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 374–75 (S.D.N.Y.2003)); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540–41, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st Dep't 1999). Among the badges courts consider are (1) gross inadequacy of consideration; (2) a close relationship between transferor and transferee; (3) the transferor's insolvency as a result of the conveyance; (4) a questionable transfer not in the ordinary course of business; (5) secrecy in the transfer; and (6) retention of control of the property by the transferor after the conveyance. *New York Dist. Council of Carpenters Pension Fund*, 2008 WL 2115225, at *4; *United States v. Mazzeo*, 306 F.Supp.2d 294, 312 (E.D.N.Y.2004) (also considering the "existence or cumulative effect of a pattern or series of transactions or course of conduct after the . . . onset of financial difficulties, or pendency or threat of suits by creditors [and] the general chronology of the events and transactions under inquiry") (quoting *Kaiser*, 722 F.2d at 1583); *Wall St. Assocs.*, 257 A.D.2d at 529, 684 N.Y.S.2d at 247. Of course, should these badges of fraud be absent from the questioned transactions, that absence will constitute evidence that there was no intent to defraud. *New York*

*Dist. Council of Carpenters Pension Fund*, 2008 WL 2115225, at *4.

**B. Thomas Kontogiannis**

██ DLJ argues that Thomas Kontogiannis is likely to transfer his assets during the pendency of this litigation and that it is entitled to attach his properties because of (1) his alleged role as the mastermind of the mortgage scheme; (2) his criminal history, which includes his conviction in the Cunningham investigation, separate convictions for, *inter alia*, conspiracy to bribe a public official and for offenses in connection with a construction bid-rigging scheme, and, according to the complaint, various other acts of wrongdoing which have not led to findings of guilt; and (3) his alleged role in a recent sale of a purported secured claim by Bond & Walsh.

To obtain an order of attachment, a plaintiff must demonstrate each of the four elements required by the C.P.L.R. *See* N.Y. C.P.L.R. § 6212(a); *Monteleone*, 2008 WL 4541124, at *6. While proof of the merits of a plaintiff's claim, by definition, helps satisfy the first two elements for attachment (relating to whether plaintiff has stated a claim and the probability of success of that claim), it does not necessarily—nor often—speak to the third required element, i.e., whether a defendant has disposed of assets (or soon will do so) with the intent to defraud his creditors or frustrate the enforcement of a judgment. *Encore Credit Corp.*, 2006 WL 148909, at *4 ("proof that a defendant committed the underlying unlawful act is not, by itself, sufficient to establish" the third element for attachment) (citing *Executive House Realty v. Hagen*, 108 Misc.2d 986, 988, 438 N.Y.S.2d 174 (N.Y.Sup.Ct.1981)); *see also Brezenoff v. Vasquez*, 107 Misc.2d 197, 198, 433 N.Y.S.2d 553 (N.Y.Civ.Ct.1980) ("[t]he alleged merits of the underlying action may not be used to mitigate the distinct

and strict burden of proving the grounds for the prejudgment attachment").[6] Nor does it do so here. Whatever the merits of DLJ's assertions concerning Thomas Kontogiannis's leading role in the mortgage fraud scheme that forms the basis of its action—a question the Court does not now reach—those allegations do not address the question, equally pertinent to the present inquiry, of whether he intends to dispose of his assets to defraud his creditors or thwart the enforcement of a future judgment in plaintiff's favor.

Nor does DLJ's reliance on Kontogiannis's past misconduct or his purported role in the Bond & Walsh transaction alter the equation. Though DLJ's complaint and moving papers are long on allegations of his past wrongs and alleged current transgressions, entirely absent from these submissions are allegations—or, more to the point, evidentiary facts—demonstrating that Kontogiannis has intentionally attempted to secrete his assets to avoid his creditors or hinder a judgment in plaintiff's favor, or that he is on the verge of so doing. *See Bank of China v. NBM LLC,*

192 F.Supp.2d 183, 188 (S.D.N.Y.2002) ("[a]bsent evidentiary facts demonstrating a fraudulent intent, the possibility that defendants will [secrete assets] is simply too remote to justify" pre-judgment attachment); *Signal Capital Corp. v. Frank,* 895 F.Supp. 62, 64–65 (S.D.N.Y.1995) (intent to defraud element not satisfied where plaintiff "points to no actual or pending transfers or dispositions of assets that would frustrate a judgment in favor of [plaintiff] ... but asks that the danger of this occurring be presumed from" past misconduct in a related action where intent to defraud was not found; fact that prior misconduct involved fraudulent transfers of assets made with constructive knowledge of fraud did not require different outcome). In this regard, the most plaintiff can muster is a wholly conclusory assertion in its December 19, 2008 letter that Bond & Walsh, a company Kontogiannis allegedly controls, sold a supposedly secured, but controverted, claim that had been filed in a bankruptcy proceeding because "Mr. Kontogiannis needed to liquidate the Secured Claim to secrete the proceeds, as he has

---

**6.** In concluding that a plaintiff is not entitled to an order of attachment where it "confuses the allegations that are the basis for the cause of action with the grounds necessary for attachment," the *Brezenoff* court relied in part on the legislative history of the 1977 amendments to the New York attachment statute. 107 Misc.2d at 198, 433 N.Y.S.2d 553. Prior to its amendment in 1977, C.P.L.R. § 6201 had permitted attachment based solely on the nature of the underlying cause of action. *See, e.g., id.;* David D. Siegel, *New York Practice* § 314 (4th ed. 2009). The decision to make these requirements more stringent was explained in the 1977 Judicial Conference Report:

> [t]he present statute, in authorizing attachment in these cases [of fraud, deceit, and conversion], apparently indulges in the unproven presumption that defendants charged with the stated wrongs are more likely to indulge in conduct frustrating the enforcement of a future judgment in plain-

tiff's favor than defendants in other cases. The provisions are of dubious constitutional validity. There is no reason why a defendant charged, for example, with conversion is more likely to tamper with his property than one sued for assault, wrongful death or negligence. In the absence of compelling reasons, drastic interference with the free use and enjoyment of defendant's property should not be authorized on the basis of limited judicial cognition, long before defendant has his full day in court and his liability has been established.

*Report of the Judicial Conference of the State of New York to the 1977 Legislature,* at 251 (1978); *see* Joseph M. McLaughlin, *Practice Commentaries,* McKinney's Cons. Laws of N.Y., Book 7B, CPLR C6201:1, at 12 (1980) (recognizing that following the 1977 legislation, "the nature of an action (e.g., fraud, conversion) is no longer a ground for attachment").

been doing with many other assets since the time of his arrest in the Cunningham Scam."[7] (Pl.'s Dec. 19, 2008 letter at 1.) Whatever the role of this transaction in the wholly unrelated bankruptcy proceeding, plaintiff provides no evidence, aside from its timing, to indicate that the sale is suspicious in the context of this Court's inquiry into whether Kontogiannis has intentionally disposed of assets to defraud his creditors or frustrate the enforcement of a judgment. Even assuming Kontogiannis *currently* controls Bond & Walsh and thus was responsible for the sale—itself a bald claim that, at this time, lacks any evidentiary support—the mere fact that the transaction occurred in temporal proximity to the start of this case does not overcome the conclusory nature of the allegation and does not evince fraudulent intent.[8] *See Colon v. Cole Bros. Circus, Inc.*, No. 04–CV–3606, 2007 WL 3014706, at *3 (E.D.N.Y. Oct. 12, 2007).

Because the grounds cited by DLJ do not establish that Thomas Kontogiannis has disposed of his assets (or will soon do so) with the intent to defraud his creditors or to frustrate the enforcement of a judg-ment that might be rendered in plaintiff's favor, the Court denies the company's motion for an order of attachment as to his properties and declines to address whether DLJ has shown a probability of success on the merits of its claims against him.[9]

## C. John Michael

DLJ argues that John Michael's February 1, 2007 transfer of the Massapequa property to his wife, Corinne, is evidence of his intent to defraud his creditors or to frustrate the enforcement of a judgment and therefore justifies attachment of his properties. Michael argues that he transferred the property "primarily to ensure that the family would have access to home equity if necessary to pay debts." (The Michaels's Reply Mem. in Opp. at 2.)

It is true as an initial matter that the Massapequa property transfer exhibits several of the "badges of fraud" which may give rise to a sufficient inference of intent. *See New York Dist. Council of Carpenters Pension Fund*, 2008 WL 2115225, at *4. DLJ alleges, and Michael does not dispute, that he transferred the property for nominal consideration, has a close relationship

---

**7.** DLJ's reference to the "many other assets" that Kontogiannis has been liquidating and secreting since his arrest in the Cunningham investigation obviously cannot refer to the 95 transactions which are the subject of the fraud charged in the complaint, all of which occurred prior to his arrest in the Cunningham investigation. More importantly, plaintiff nowhere identifies—in the December 19, 2008 letter, or elsewhere—what other assets it believes he has attempted to hide.

**8.** In its December 22, 2008 letter to the Court, DLJ claims that, even assuming that the Bond & Walsh transaction was a legitimate transfer, it still justifies attachment because "Bond & Walsh held a valuable asset that DLJ sought to attach to enforce against a future judgment and it interfered with that interest by assigning it to JM Acquisition." (Pl.'s Dec. 22, 2008 letter at 1.) DLJ misses the point. Whether an order of attachment should issue

depends precisely on whether the Bond & Walsh transaction is legitimate, or whether it indicates an intent to defraud creditors or frustrate a judgment in plaintiff's favor. Absent a showing of fraudulent intent—and plaintiff, at this juncture, has failed to make this required demonstration—DLJ possesses no legally cognizable interest in any specific asset of Bond & Walsh, including the allegedly secured claim.

**9.** As noted during the December 3, 2008 hearing, Thomas Kontogiannis and certain other defendants defaulted on the instant motion. However, that default will not support the entry of an order granting the provisional relief plaintiff seeks where, as here, DLJ has failed to demonstrate even *prima facie* its entitlement to that relief in the manner prescribed by N.Y. C.P.L.R. § 6212(a) and the relevant case law.

with the transferee (his wife), and retained control of the property, the family home, even after the conveyance. On the other hand, there is no evidence that Michael was rendered insolvent as a result of the transfer or that it was effected in secret. Nor can DLJ point to the "existence or cumulative effect of a pattern or series of transactions or course of conduct after the . . . onset of financial difficulties or threat of suits by [John Michael's] creditors." *See Mazzeo,* 306 F.Supp.2d at 312.

Indeed, the "general chronology of the events and transactions under inquiry" militates against a finding of fraudulent intent. *Id.* The single transaction plaintiff points to as an example of Michael's attempt to defraud creditors or thwart a judgment in DLJ's favor occurred at a time when, on this limited record, it is unclear whether Michael even had creditors (or knew he would in the future) and nearly two years before DLJ initiated the present action. Absent at least some additional evidence dating from the time of the transfer to indicate fraudulent intent, that span of time simply is too wide to infer that the conveyance was the product of an impermissible motive. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 179 (2d Cir.2004) (no inference of fraudulent intent where transfers in question occurred "nearly two years before [defendant] filed for bankruptcy and before the judgments were entered against [him] that would motivate him to conceal his assets"); *In re Manshul Constr. Corp.,* No. 97–CV–8851, 2000 WL 1228866, at *50–51 (S.D.N.Y. Aug. 30, 2000) (defendants' transfers of millions of dollars shortly after threats from creditors and the arrest of one defendant exhibited suspicious timing; in contrast, other transfers of smaller sums, effected two months before the risk of increased exposure manifested, were not suspicious as to timing); *United States v. McCombs,* 928 F.Supp. 261, 275–77 (W.D.N.Y.1995) (fraudulent intent not established where it was unclear from the facts whether transferor was aware of her indebtedness at the time of her allegedly fraudulent familial conveyance). Nor does this conclusion alter if the Court views the Massapequa property transfer, as DLJ urges, against the backdrop of the government's investigation and prosecution of John Michael in the Cunningham investigation. According to plaintiff, Michael transferred the Massapequa property on February 1, 2007. While DLJ asserts that the transaction occurred "around the time he was being prosecuted and convicted in the Cunningham Scam" (Pl.'s Decl. in Further Supp. of Mot. ¶ 7) and surmises from that alleged proximity an intention to defraud, no such inference is warranted by the facts. It appears that Michael had not yet been charged at the time of the transfer (an event that would occur about two weeks later, on February 13, 2007), *United States v. Michael,* 07–CR–330 (S.D.Cal.), Docket Entry No. 1, would not plead guilty in connection with the Cunningham investigation until just over a year later (on February 4, 2008) (The Michaels's Reply Mem. in Opp., Ex. 1), and would not be sentenced—in a sentencing proceeding that noted his solvency but did not order restitution—for another 20 months (on October 2, 2008) (The Michaels's Reply Mem. in Opp., Ex. 3 at 39.) Without more, the Court cannot, on this record, conclude that John Michael intended to defraud his creditors or frustrate a judgment in plaintiff's favor when he conveyed the Massapequa property to his wife.

In order to be awarded the "harsh and extraordinary" remedy of attachment, *Bank of China,* 192 F.Supp.2d at 186, plaintiff must satisfy the Court—with evidence—that fraudulent intent really exists in the mind of the defendant, *Encore Cred-*

*it Corp.*, 2006 WL 148909, at \*3; *Societe Generale Alsacienne De Banque, Zurich*, 118 A.D.2d at 772, 500 N.Y.S.2d at 281. Here, DLJ has, at best, raised a mere suspicion of Michael's intent to defraud. That does not suffice. Its motion for an order of attachment as to his properties therefore is denied. *See Strategic Growth Int'l, Inc.*, 2008 WL 4179235, at \*8.

**D. Annette Apergis**

 DLJ next asserts that it is entitled to an order of attachment against properties owned by Annette Apergis on the ground that she fraudulently intends to transfer her assets during the pendency of this litigation. As evidence of fraudulent intent, DLJ alleges that Apergis failed to record the deeds for three properties she owns, the Glen Head property and the Rosedale properties, until long after she purchased them in order to hide those properties from government detection in the Cunningham investigation.

Plaintiff's focus on the allegedly suspicious timing of the deed recordings and, inferentially, on the secrecy of Apergis's purchases of those assets, without more, is insufficient to sustain an order of attachment. At a basic level, plaintiff's fraudulent intent allegations as to Apergis simply do not make sense on the limited record it provides. DLJ makes much of the fact that Apergis allegedly recorded the Glen Head property about a week after her father, Thomas Kontogiannis, pled guilty in the Cunningham investigation, and waited to record the deed to the 134–20 property until July 2007, after he was sentenced. However, it provides no evidence or even a theory to explain why that close

timing would in any way serve to hide these properties from any government investigation into Apergis herself or preserve them from a judgment in any subsequent government action directed against her.[10]

More fundamentally, plaintiff proffers nothing besides innuendo to indicate that Apergis was even the subject of government inquiry in the Cunningham investigation in the first place. While her decision to wait to record deeds on these properties might raise an inference of fraudulent intent if, to begin, DLJ could show that Apergis actually was indebted to a creditor or was imperiled by the Cunningham investigation as a target, plaintiff does not provide even this minimal context in support of its motion. In the absence of any evidence—as opposed to conclusory assertions—that would permit the Court to infer from the circumstances surrounding the recording of the deeds on these properties an intent to defraud a creditor or frustrate a judgment in plaintiff's favor, DLJ's motion for an order of attachment against Annette Apergis's properties must be denied. *See Encore Credit Corp.*, 2006 WL 148909, at \*3.

**E. Elias Apergis, Loring Estates, and Group Kappa**

DLJ moves on to argue that it is entitled to attach the properties of Annette Apergis's husband, Elias Apergis, and corporate RICO defendants Loring Estates and Group Kappa. Plaintiff urges that it has demonstrated fraudulent intent on the part of these three defendants by providing evidence that Loring Estates and Group Kappa each transferred, at the di-

---

**10.** The third allegedly suspicious recording, for the 134–22 property, occurred in January 2007, at least several weeks before Kontogiannis pled guilty. DLJ makes no effort to square the timing of this misfit late recording with its theory that Annette Apergis defrauded creditors by waiting until after her father pled guilty or was sentenced in the Cunningham investigation.

rection of Elias Apergis, a set of three properties—the Loring properties and the Group Kappa properties, respectively—to Plaza Real Estate in September 2008. According to DLJ, these transfers were effected for nominal consideration, involved properties that correspond to six of the 95 fraudulent transactions that allegedly defrauded the company—and as such, were properties that Loring Estates and Group Kappa allegedly should not even have been in a position to sell, because they had *already* sold them once before, without recording the sale—and were made to defraud creditors, including DLJ.

**1. Fraudulent Intent**

 Here, DLJ's evidence indicates that several badges of fraud are present with respect to the transfers of the Loring and Group Kappa properties. First, it seems that each of the properties, which were initially encumbered by mortgages ranging in value from $340,000 to about $600,000 (*see* Compl., Ex. 6), were transferred for nominal consideration (*see* Pl.'s Decl. in Further Supp. of Mot., Exs. 9, 10) in transactions the substance of which defendants do not contest. Second, on the current record, the transfers appear to be questionable and not in the ordinary course of business. Plaintiff has adequately shown, and again, defendants do not dispute, that the Loring and Group Kappa properties originally were conveyed by the selling entities—including, in each case, by Elias Apergis as the seller's representative—to third parties and encumbered by mortgages that were never recorded. (*See, e.g.,* Compl., Ex. 6.) Having ostensibly disposed of these properties at a profit already, Loring Estates's and Group Kappa's efforts to sell the properties a second time, again represented by Elias Apergis, raises a real inference of fraud. Third, the timing of the transfers, which occurred between September 8 and September 10,

2008 and were recorded as late as the third week in October (*see* Pl.'s Decl. in Further Supp. of Mot., Exs. 9, 10), while perhaps not dramatic on its own, is at least somewhat suspicious given their proximity to plaintiff's November 13, 2008 complaint filing. Although the transfers do not exhibit all the badges of fraud, the Court is persuaded that the collective weight of those factors that have been shown is sufficient to conclude that Elias Apergis, Loring Estates, and Group Kappa disposed of property with the intent to defraud their creditors or frustrate the enforcement of any judgment in plaintiff's favor.

**2. Probability of Success on the Merits**

Because DLJ satisfies the third required element of attachment against this subset of defendants, the Court must determine whether plaintiff has demonstrated a probability of success on the merits of its claims against them such that an order of attachment as to their properties should issue. *New York Dist. Council of Carpenters Pension Fund,* 2008 WL 2115225, at *1.

**a. The Substantive RICO Claim**

 DLJ's primary causes of action against Elias Apergis, Loring Estates, and Group Kappa, and the only claims it makes any effort to argue on the instant motion, are for violations of RICO, 18 U.S.C. §§ 1962(c), (d). In order to establish a substantive § 1962(c) RICO violation, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco v. Bernas,* 244 F.3d 286, 306 (2d Cir.2001) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). These requirements must be satisfied as to each individual defendant. *DeFalco,* 244 F.3d at 306.

"Racketeering activity" is defined to include a number of specific state and federal offenses. 18 U.S.C. § 1961(1). A "pattern of racketeering", in turn, "requires at least two acts of racketeering activity ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Moreover, in order to constitute a pattern, these acts of racketeering activity must be "related, and either amount to or pose a threat of continuing criminal activity." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir.2008). This "continuity" requirement may be established "either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Id.* Finally, where a plaintiff alleges predicate acts that sound in fraud, those allegations must be pleaded with particularity under Federal Rule of Civil Procedure 9(b) and must contain facts "that give rise to a *strong* inference of fraudulent intent." *First Capital Asset Mgmt.*, 385 F.3d at 178–79 (emphasis in original) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir.1999)).

Against this backdrop of statute and precedent, the Court cannot say that DLJ has stated a claim against Elias Apergis, or Loring Estates, or Group Kappa for a substantive violation of RICO, let alone that it has a probability of success on the merits of such a claim. Plaintiff lists the predicate acts it alleges the RICO defendants committed, including mail, wire, and bank fraud, money laundering, and bribery, in paragraph 91 of its complaint. However, rather than identify the specific predicate acts it alleges each de-

fendant committed, as required for a violation of § 1962(c), *DeFalco*, 244 F.3d at 306, the company simply clumps together the more than 20 RICO defendants it sues and alleges, without any distinction among them, that all of these defendants committed all of the enumerated acts. This blunderbuss and conclusory pleading style, without amplification by affidavit or other evidentiary vehicle, does not state a claim against these defendants.

First, the allegations that the RICO defendants committed money laundering and bribery are, as to Elias Apergis, Loring Estates, and Group Kappa, entirely conclusory and without even passing support in the complaint or plaintiff's motion papers. Second, as to plaintiff's mail, wire, and bank fraud allegations, paragraph 91's reliance on group pleading against all "RICO Defendants" fails to satisfy the heightened pleading requirements of Rule 9(b). *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants' "); *Jackson Nat. Life Ins. Co. v. Ligator*, 949 F.Supp. 200, 208 (S.D.N.Y.1996) (plaintiff's "failure to distinguish among the 'Ligator Defendants' [was] an egregious example of prohibited 'group pleading' ").

The rest of the complaint, as currently fashioned, only highlights the insufficiency of the group pleading technique plaintiff employs in paragraph 91. Although DLJ alleges that the RICO defendants committed wire fraud by disbursing illicit funds to the settlement agents for each of the 95 fraudulent transactions and bank fraud by selling or causing to sell fraudulent mortgages to federally chartered institutions, the company's own narrative of events makes clear that, at most, it was only a subset of the RICO defendants—and a subset that did not include Elias Apergis,

Loring Estates, and Group Kappa—that may have engaged in these specific predicate acts.

The remaining predicate acts plaintiff enumerates—that the RICO defendants committed mail and wire fraud by sending monthly mortgage payments to DLJ's out-of-state loan servicers in order to conceal the underlying mortgage fraud—is, at least as to Elias Apergis and Group Kappa, slightly closer to the mark. In its Declaration in Further Support of the instant motion, DLJ asserts that Apergis signed at least one check issued to one of DLJ's servicers, allegedly in an effort to conceal the fraud (Pl.'s Decl. in Further Supp. of Mot. ¶ 19), and that Group Kappa was the payor of at least one check that was sent to a DLJ servicer for an allegedly similar purpose (*id.* ¶ 36). However, even here, DLJ's allegations are insufficient to state a substantive RICO claim. To establish the RICO pattern element, a plaintiff must show that each defendant committed at least two predicate acts of racketeering activity. *DeFalco,* 244 F.3d at 306. Allegations that Apergis and Group Kappa each committed a single violation of the mail or wire fraud statutes are inadequate to show a pattern.

Moreover, as currently constituted, these allegations do not include facts that show how the two communications DLJ identifies as fraudulent, were, in fact, so, *see Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999), or that give rise to a *strong* inference of fraudulent intent, *First Capital Asset Mgmt.,* 385 F.3d at 179. To establish even a single predicate act sounding in fraud, let alone a pattern of such acts, as required by RICO, plaintiff must plead the particular details

of the fraudulent act, explain why the communication was fraudulent, and allege facts showing a strong inference of fraudulent intent on the part of the actor.[11] *See, e.g., First Capital Asset Mgmt.,* 385 F.3d at 178–79; *Mills,* 12 F.3d at 1175. Because plaintiff has not, on this record, made the required showing, it has failed to demonstrate a probability of success on the merits of its substantive RICO claim and is not entitled to attachment on that basis.

### b. The RICO Conspiracy Claim

Whether DLJ has established a RICO conspiracy claim under 18 U.S.C. 1962(d) is a closer question. The requirements for such a claim are "less demanding" than those for a substantive violation. *First Capital Asset Mgmt.,* 385 F.3d at 178 (quoting *Baisch v. Gallina,* 346 F.3d 366, 376 (2d Cir.2003)). To be liable, a conspirator "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that [he] has adopted the goal of furthering or facilitating the criminal endeavor." *Id.; see Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

Here, plaintiff has alleged in boilerplate fashion reminiscent of certain of its § 1962(c) allegations, that the RICO defendants, as a whole, "agreed to conduct or participate in the affairs of the [RICO] enterprise through a pattern of racketeering activity" and "knew their conduct or the conduct of their co-conspirators constituted a pattern of racketeering activity." (Compl. ¶ 94.) While this paragraph recites the required language, DLJ does not provide sufficient allegations—or, for attachment, the required evidentiary show-

---

11. DLJ's complaint and motion papers explain how these two transactions deepened its slumber and facilitated the alleged mortgage fraud. Nothing is offered to show that the mere isolated payment of two mortgage obligations on behalf of another evidenced a fraudulent intent on the part of the payors.

ing of "proof stronger than that required to establish a prima facie case," *New York Dist. Council of Carpenters Pension Fund,* 2008 WL 2115225, at *1—from which the Court might infer that Apergis, Loring Estates, and Group Kappa "knew about and agreed to facilitate the scheme," *Baisch,* 346 F.3d at 377; *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25, 26 n. 4 (2d Cir.1990) (requiring, at the pleading stage, "some factual basis for a finding of a conscious agreement among the defendants" accused of RICO conspiracy); *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 00–CV–8688, 2002 WL 362794, at *6, *9 (S.D.N.Y. Mar. 06, 2002) (finding no factual basis for conscious agreement in amended pleading which "vague[ly]" alleged, on information and belief, that one defendant "operated and controlled" other defendant entities). Absent this showing, DLJ has failed to demonstrate a probability of success on the merits of its claims against these three alleged RICO coconspirators that would warrant attachment of their properties.[12]

## F. Remaining RICO Defendants

Finally, DLJ seeks to attach the properties of the remaining RICO defendants on the basis of (1) their alleged involvement in the underlying mortgage fraud scheme; (2) with respect to Adam DiPinto and Bond & Walsh, entirely conclusory allegations that they have fraudulently begun to secrete assets to thwart a judgment or defraud creditors; and (3) with respect to Georgia Kontogiannis, bare allegations of past misconduct. As previously discussed, neither proof on the merits of plaintiff's underlying claims, nor speculative accusations that a defendant has disposed (or will

dispose) of assets with intent to defraud, is sufficient to satisfy the third required element of attachment. *See, e.g., Encore Credit Corp.,* 2006 WL 148909, at *4; *Signal Capital Corp.,* 895 F.Supp. at 64–65. Plaintiff's motion for an order of attachment against properties owned by the remaining RICO defendants is also denied.

## III. *DLJ's MOTION FOR A PRELIMINARY INJUNCTION*

### A. Legal Standard

■ DLJ also seeks a preliminary injunction restraining the RICO defendants from transferring or disposing of their assets and enjoining the fraudulent transferee defendants from transferring or disposing of certain enumerated real properties, primarily so as to preserve these assets in anticipation of a judgment in DLJ's favor. (*See* Pl.'s Mem. in Supp. of Mot. at 9–10.) In order to obtain this preliminary injunctive relief, DLJ must establish "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info, Inc.,* 375 F.3d 190, 192 (2d Cir.2004).

### B. Plaintiff's Claims at Law (Counts One Through Six and Count Eight)

Plaintiff's November 13, 2008 complaint initiated what is primarily an action at law. Plaintiff seeks a money judgment of approximately $50 million and alleges as its principal (and sole federal) causes of action violations of RICO. The preliminary injunction it requests, to freeze defendants'

---

**12.** The Court further concludes that plaintiff's remaining state law claims, which the company makes no attempt even to argue substanti- ate its attachment request, do not justify attachment.

assets in order to satisfy a subsequent judgment in this litigation, must be seen as largely in service of its claims at law.

 However, the Supreme Court has held that district courts lack the authority "to issue a preliminary injunction preventing [a defendant] from disposing of [its] assets pending adjudication" of a plaintiff's claim for money damages. *Grupo Mexicano de Desarrollo v. Alliance Bond Fund,* 527 U.S. 308, 333, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111, 117 n. 8 (2d Cir.2007) ("federal courts lack power to issue . . . [i]njunctions that prohibit a party from transferring assets pending resolution of an action"). DLJ's broad motion to enjoin the RICO defendants from disposing of their property in order to protect any money judgment DLJ may obtain on its claims at law in counts one through six and count eight of the complaint is therefore denied. See *Colon,* 2007 WL 3014706, at *1.

## C. Plaintiff's Equitable Claims (Count Seven and Counts Nine Through Thirteen)

Aside from its causes of action arising at law, DLJ also asserts claims in equity, seeking a constructive trust (counts nine

and eleven) and to avoid certain allegedly fraudulent conveyances (counts seven, ten, twelve, and thirteen). An injunction for these equity claims may be available, notwithstanding *Grupo Mexicano,* if plaintiff satisfies the ordinary requirements for such relief. *See, e.g., OSRecovery, Inc. v. One Groupe In'l, Inc.,* 305 F.Supp.2d 340, 348 n. 43 (S.D.N.Y.2004); *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va.,* 144 F.Supp.2d 241, 249, 250 n. 9 (S.D.N.Y.2001); *see also United States ex rel. Rahman v. Oncology Assocs.,* 198 F.3d 489, 494–98 (4th Cir.1999).[13]

### 1. The Constructive Trust Claims

 In order to prevail on a claim for a constructive trust under New York law, a plaintiff generally must show "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment." *In re First Cent. Fin. Corp.,* 377 F.3d 209, 212 (2d Cir.2004); *Sharp v. Kosmalski,* 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976). Here, plaintiff altogether fails to plead the existence of a confidential or fiduciary relationship between it and any of the defendants against whom it asserts its constructive trust claim.[14] Nor does it articulate in any fash-

13. In *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,* 295 F.Supp.2d 366, 388–390 (S.D.N.Y.2003) ("*JSC* "), the district court determined it did not have the power to issue a preliminary injunction in "an action at law primarily for a money judgment" where plaintiff also alleged certain equitable claims. The court concluded that plaintiff's suit, which sought to enforce a judgment against the alleged alter egos of an entity held liable in a previous action and, *inter alia,* set aside several allegedly fraudulent conveyances made by one of the purported alter egos, was more akin to *Grupo Mexicano* than the case presented to the Fourth Circuit in *Rahman,* because "the equitable relief . . . including the setting aside

of alleged fraudulent conveyances, is incidental to, and indeed contingent upon the success of, the plaintiff's alter ego action." *JSC,* 295 F.Supp.2d at 389 & n. 10. In this case, even though plaintiff's claims at law and equity clearly are closely related, the viability of the equity claims is not strictly contingent upon the success of DLJ's legal causes of action. The Court thus may grant injunctive relief in furtherance of plaintiff's equitable interests. *See Rahman,* 198 F.3d at 496–97.

14. Indeed, the contractual relationship DLJ pleads exists between it and Coastal Capital, and through which all 95 challenged transactions flow, may affirmatively preclude the re-

ion why it is likely to succeed on the merits of these claims or that there are sufficiently serious questions going to the merits. As a consequence, its motion for a preliminary injunction in furtherance of its constructive trust claims is denied.

### 2. The Fraudulent Conveyance Claims

DLJ alleges four fraudulent conveyance claims, arising under New York's Debtor & Creditor Law, § 270, *et seq.* (the "DCL"), against (1) Coastal Capital, for transferring monies it received from DLJ to the RICO defendants (count seven); (2) Adam DiPinto, for transferring the Jamaica properties to Block 13434 Development, an alleged shell company, and others (count ten); (3) Corinne Michael, as transferee of the Massapequa property from her husband, John Michael (count twelve); and (4) Plaza Real Estate, an alleged shell company, as transferee of the Loring and Group Kappa properties (count thirteen). Plaintiff seeks to set aside these transactions and, to that end, has requested a preliminary injunction freezing the transferred properties so that they may not be placed beyond recovery—for example, by a transfer to a bona fide purchaser—during the pendency of the litigation.[15] Although DLJ does not identify the specific provisions of the DCL it believes defendants violated, it recites in each count, and for the most part, without factual elaboration elsewhere in the body of its complaint or motion papers, language that tracks sections 273, 274, and 276 of the statute.

██ A conveyance is deemed constructively fraudulent and in violation of DCL § 273 if it is made without "fair consideration" and the transferor is insolvent or will be rendered insolvent by the transfer. DCL § 273; *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir.2005); *American Panel Tec v. Hyrise, Inc.*, 31 A.D.3d 586, 587, 819 N.Y.S.2d 768, 769 (2d Dep't 2006). Similarly, a conveyance violates DCL § 274 if it is made without "fair consideration" and the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital. DCL § 274; *In re Sharp Int'l Corp.*, 403 F.3d at 53. Neither of these constructive fraud theories need be pleaded with particularity to survive a motion to dismiss. *Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co.*, 375 F.Supp.2d 257, 268 (S.D.N.Y.2005).

██ In contrast, DCL § 276 declares fraudulent "every conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." To succeed on a claim under this provision, a plaintiff must show actual intent to defraud creditors on the part of the transferor. DCL § 276; *In re Sharp Int'l Corp.*, 403 F.3d at 56; *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 126, 508 N.Y.S.2d 17, 20 (2d Dep't 1986). "Proof of actual fraudulent intent makes a *prima facie* case and shifts to the grantee the burden of establishing his good faith in the transfer." *United States v. Orozco–Prada*, 636 F.Supp. 1537, 1541 (S.D.N.Y.1986); *see Brody v. Pecoraro*, 250 N.Y. 56, 61–62, 164

---

lief it seeks under its constructive trust claims. *See In re First Cent. Fin. Corp.*, 377 F.3d at 213–14 & n. 4 (concluding that existence of written agreement barred constructive trust claims); *see generally Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987).

**15.** The Court may enjoin a defendant from disposing of property that has been fraudulently conveyed, or may set aside the transaction in its entirely, under DCL § 279. *See, e.g., Stevens v. Aeonian Press, Inc.*, No. 00–CV–6330, 2002 WL 31387224, at \*7 (S.D.N.Y. Oct. 23, 2002).

N.E. 741 (1928) (Cardozo, J.). Finally, because "actual intent to hinder, delay, or defraud constitutes fraud," plaintiff must plead its claim with the particularity required by Rule 9(b). *In re Sharp Int'l Corp.*, 403 F.3d at 56.

DLJ's fraudulent conveyance claims against Coastal Capital and Adam DiPinto, as presently articulated, are nothing but conclusory and do not raise sufficient questions as to their merits to justify restraint by preliminary injunction under any provision of the DCL.

 Nor does plaintiff's claim against Corinne Michael justify an injunction. With respect to the constructive fraud claims, the burden ordinarily lies with the plaintiff to show that the conveyance it challenges was improper. *See United States v. McCombs*, 30 F.3d 310, 324 (2d Cir.1994) (citing *American Inv. Bank v. Marine Midland Bank*, 191 A.D.2d 690, 692, 595 N.Y.S.2d 537, 538 (2d Dep't 1993)). However, where, as here, the transfer was made between husband and wife, the burden shifts to the transferee to prove the adequacy of consideration, and, if she fails to do so, to prove continued solvency after the transaction. *Fed. Nat. Mortgage Ass'n v. Olympia Mortgage Corp.*, No. 04–CV–4971, 2006 WL 2802092, at *8 (E.D.N.Y. Sept. 28, 2006); *Miner v. Edwards*, 221 A.D.2d 934, 634 N.Y.S.2d 306 (4th Dep't 1995). It is uncontested, of course, that the Massapequa property transfer was made without fair consideration. However, evidence on the record from John Michael's sentencing hearing indicates that, as of October 2, 2008, he was solvent, (*see* The Michaels's Reply Mem. in Opp., Ex. 3 at 39), and DLJ does not offer any proof that would lead the Court to conclude otherwise. The factually unchallenged proof of solvency dooms this constructive fraud claim. As to the actual intent to defraud claim under § 276,

the Court has already held that the Massapequa property transfer did not exhibit sufficient badges of fraud to permit the conclusion that John Michael acted with fraudulent intent. *See* Part II.C., *supra.* No injunction should thus issue against Corinne Michael.

 However, DLJ's final claim, against Plaza Real Estate as transferee of six properties (the Loring and Group Kappa properties) which correspond to six of the 95 fraudulent transactions that allegedly defrauded plaintiff, requires the opposite conclusion. As an initial matter, plaintiff's constructive fraud claims will not support a preliminary injunction because the company has provided no more than a naked allegation that either of the transferring entities, Loring Estates and Group Kappa, was insolvent at the time of the questionable transfers or was rendered that way by them, as required by DCL § 273, or that either engaged in or was about to engage in a business transaction for which its remaining property constituted unreasonably small capital, as necessary under § 274. However, as the Court has previously concluded, the record is sufficient at this preliminary stage to show that Loring Estates and Group Kappa actually intended to defraud creditors (specifically including DLJ) under DCL § 276 when they effected the transfers at issue. *See* Part II.E., *supra.*

Because DLJ has shown proof of actual fraudulent intent on the part of the transferors, the burden shifts to the transferee, Plaza Real Estate, to show that it was a bona fide purchaser of the properties for value. *See Sec. Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 318 (Bankr.S.D.N.Y.1999); *Orozco–Prada*, 636 F.Supp. at 1541; *Brody v. Pecoraro*, 250 N.Y. at 61–62, 164 N.E. 741. Notwithstanding, Plaza Real Estate, which has not

appeared in this action,[16] has till now provided no evidence to indicate that it acted in good faith when it purchased—for, allegedly, nominal consideration—the Loring and Group Kappa properties, and, on an examination of the limited record, the Court finds none. Plaintiff thus has established a likelihood of success on the merits of its fraudulent conveyance equity claim against Plaza Real Estate under DCL § 276.

Moreover, DLJ has established irreparable harm as to this claim, as well. In the absence of an injunction, Plaza Real Estate would be free during the pendency of this action to convey the Loring and Group Kappa properties to a bona fide purchaser, thereby placing those properties beyond plaintiff's reach. *See* DCL § 278 (remedy of setting aside fraudulent conveyance is unavailable where property is sold to a "purchaser for fair consideration without knowledge of the fraud at the time of the purchase"); *Ostashko v. Ostashko*, No. 00–CV–7162, 2002 WL 32068357, at *27 (E.D.N.Y. Dec. 12, 2002).

Because it has made the requisite showing for a preliminary injunction on its DCL § 276 claim against Plaza Real Estate, the Court will enjoin Plaza Real Estate from transferring or encumbering the Loring and Group Kappa properties while this litigation continues. *See Rahman*, 198 F.3d at 494–98; *OSRecovery, Inc.*, 305

F.Supp.2d at 348 n. 43; *Quantum Corp. Funding, Ltd.*, 144 F.Supp.2d at 249, 250 n. 9; *see also Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F.Supp.2d 341, 349–50 (N.D.N.Y.2001) (holding that *Grupo Mexicano* did not bar injunction preventing further transfer of asset that was subject of fraudulent conveyance claims).

## IV. CONCLUSION

For the foregoing reasons, the Court denies plaintiff's motion for attachment in its entirety. Plaintiff's motion for a preliminary injunction is also denied, except as to defendant Plaza Real Estate, which is hereby enjoined during the pendency of this litigation from transferring, assigning, encumbering, or in any way disposing of the real properties located at: (1) 434 Amber Street, Brooklyn, N.Y. 11208; (2) 1442 Loring Avenue, Brooklyn, N.Y. 11208; (3) 607 Emerald Street, Brooklyn, N.Y. 11208; (4) 140–28/30 184th Street, Springfield Gardens, N.Y. 11413; (5) 140–23 183rd Street, Springfield Gardens, N.Y. 11413; and (6) 140–27 183rd Street, Springfield Gardens, N.Y. 11413. Plaintiff shall post a bond in the amount of $50,000 as security for the payment of any costs or damages which may be incurred by defendants if the relief herein is found to be improvidently granted. The temporary restraining order entered November 17, 2008 and continued on December 3, 2008 is vacated.

---

**16.** At the time of the December 3, 2008 hearing on the order to show cause, Plaza Real Estate had not been served. Plaintiff now represents that Plaza Real Estate was incorporated in Delaware in July 2008, registered to do business in New York on December 1, 2008, and that the official records that correspond to these filings became available to plaintiff only on December 10, 2008. (*See* Pl.'s Dec. 10, 2008 letter at 1.) In any event, the Docket reflects that DLJ subsequently served this defendant on December 11, 2008. *See* Docket Entry No. 80. Since then, Plaza Real Estate has interposed no opposition to

plaintiff's application for prejudgment relief against it and the other defendants. If, consistent with its obligations under Rule 11, Plaza Real Estate believes it has a basis on which to oppose DLJ's motion, it is granted leave to seek relief from the injunction ordered on this Memorandum and Order. In the interim, this defendant is no worse off than it was prior to the issuance of this order but subsequent to the Court's previous grant of the temporary restraining order that would have enjoined transfer had the order been timely served on Plaza Real Estate.

As for defendant Block 13434, the Court makes no determination of the motion since the parties agreed to adjourn it. On or before January 26, 2009, plaintiff shall advise the Court whether it intends to pursue the motion against that defendant; otherwise the motion as to that defendant will be deemed abandoned and denied on that basis.

Magistrate Judge Levy is respectfully requested to schedule a conference as soon as counsel can be heard to consider plaintiff's request for an expedited discovery schedule.

Plaintiff is granted leave to amend its complaint without further motion, provided it does so on or before February 10, 2009. Defendants' time to move against or answer the original complaint, or the amended complaint should there be one, is extended to and including March 3, 2009.

SO ORDERED.